# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                   No. CR 09-0865 JB

CAROLYNNE TILGA and
MICHAEL CHANDLER,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Carolynne Tilga's Memorandum in Aid of Sentencing of Defendant Carolyne Tilga and Limited Objections to Presentence Report, filed October 6, 2011 (Doc. 161)("Tilga's Sentencing Memo."); (ii) Defendant Michael Chandler's Sentencing Memorandum and Request for a Reasonable Sentence, filed August 23, 2011 (Doc. 154)("Chandler's Sentencing Memo.");[1] and (iii) Government's Sentencing Memorandum, filed October 8, 2011 (Doc. 162)("Gov't Sentencing Memo."). The Court held an evidentiary hearing on October 13, 2011. The primary issues are: (i) whether the tax loss calculation should be $23,200.00 or $ 1,937,273.00 (United States Dollars); (ii) whether Defendants Carolynne Tilga and Michael Chandler used sophisticated means to commit the offense of conviction; (iii) whether Tilga and Chandler used special skills to commit the offense of conviction; (iv) whether Tilga should was

---

[1]Defendant Michael Chandler also filed Defendant Michael Chandler's Objection to the Pre-Sentence Report on August 9, 2011 (Doc. 152). Because Chandler did not address his objection at the hearing and because the objection is not relevant to the Court's conclusions in this memorandum opinion and order, the Court will not address the objection at this time. If necessary, the Court will address Chandler's objection at the sentencing hearing, and in a subsequent memorandum opinion and order.

an organizer, leader, manager, or supervisor of the criminal activity; (v) whether the Presentence Investigation Report on Carolynne Tilga (disclosed July 26, 2011)("Tilga PSR") should acknowledge the benefits the United States obtained from the Plea Agreement, filed January 6, 2011 (Doc. 126)("Tilga Plea Agreement"); and (vi) whether the Tilga PSR should contain explicit recognition that the sentencing guidelines are advisory.[2]  The Court accepts the parties' stipulated tax loss calculation, $23,300.00 (USD), and finds that the foreign tax credit may apply post-indictment.  The Court also agrees with and accepts the parties' stipulations in the Plea Agreements that neither Tilga nor Chandler's offenses involved a special skill, an aggravating role, or obstruction of justice.  The Court will sustain Tilga and Chandler's objections to the PSRs to the extent that the PSRs are contrary to these findings.  The Court finds, however, that Tilga and Chandler used sophisticated means, as defined in U.S.S.G. § 2T1.1, and will not adopt the parties' stipulation to the contrary.  The Court concludes that Tilga's objections to the PSR's failure to acknowledge the benefits that the Plaintiff United States of America obtained from the Plea Agreement and failure to explicitly recognize the sentencing guidelines' advisory status are moot.

## FACTUAL BACKGROUND

Tilga was born in Bronxville, New York.  See Tilga PSR ¶ 51, at 22.[3]  She attended Cornell

---

[2]The Court will not address Tilga's request for a downward variance and/or downward departure, or Tilga's ability to pay a fine.  This memorandum and opinion addresses only the objections to the PSR that could impact the calculation of the guideline sentencing range.  If necessary, the Court will address Tilga's request for a variance and/or downward departure, and her objection to the PSR's analysis of her ability to a pay a fine, at the sentencing hearing and in a subsequent sentencing memorandum.

[3]Tilga did not object to any of the Tilga PSR's factual findings either in her sentencing memorandum or at the hearing.  Chandler objected to paragraph 22 of the Chandler PSR in Defendant Michael Chandler's Objection to the Pre-Sentence Report, filed August 31, 2011 (Doc. 156)("Chandler Objection").  Chandler objects to the Chandler PSR's finding that "Chandler was also known to assist [in] wiring money to and from the account." Chandler Objection at 1-2.  Other

University for her undergraduate studies in Hotel Administration and graduated in 1982.  See Tilga PSR ¶ 67, at 26; Tilga's Sentencing Memo. at 6.  Tilga received her Master of Business Administration from the Wharton School of Business at the University of Pennsylvania in 1986.  See Tilga PSR ¶ 69, at 26; Tilga's Sentencing Memo. at 6.  In 1997, Tilga moved to Santa Fe, New Mexico.  See Tilga PSR ¶ 56, at 23.  She has been in a committed relationship with Chandler since 1997, and they have two children.  See Tilga PSR ¶ 58, at 24.

Chandler was born in Boston, Massachusetts.  See Presentence Investigation Report on Michael Chandler (disclosed July 26, 2011)("Chandler PSR").  Chandler attended Boston College and Plymouth State University, but did not graduate from either.  See Chandler PSR ¶¶ 65-66, at 21.  Chandler is a "stay-at-home dad" and works for Taos Ski Academy as ski instructor.  See Chandler PSR ¶ 68, at 22.

Tilga and Chandler owned and controlled various businesses, including internet service sites, from 1998 to 2006.  See Tilga PSR ¶ 9, at 7.  Between 1999 and 2004, Tilga owned and operated an adults-only internet dating service.  See Tilga PSR ¶ 17, at 10.  Before 2002, Tilga was a partner with two Canadian businessmen, and the internet service sites were located in Canada.  See Tilga PSR ¶ 17, at 10; Tilga's Sentencing Memo. at 7.  Tilga earned income from the Canadian joint venture, in which she owned a 37.5% share, as part of her trade and business between the tax years 1999 and 2004.  See Tilga's Sentencing Memo. at 7 n.16.  After 2002, Tilga expanded the company on her own, using webcam[4] sites in addition to the standard internet dating sites with which she was

_____

than this one objection, Chandler did not contest the factual findings of the Chandler PSR either in his Objection, his sentencing memorandum, or at the hearing.

[4]A webcam is a video camera that feeds its images in real time to a computer or computer network, often via USB, ethernet, or Wi-Fi.  The name, webcam, is derived from their common use as a video camera for the World Wide Web, or internet.  Webcams are frequently used to establish

working.  See Tilga PSR ¶ 17, at 10.

Tilga was introduced to the Commonwealth Trust Company ("CTC") in 1998.[5]  See Tilga

PSR ¶ 16, at 9.  The CTC was an organization[6] that taught individuals how to purchase and manage

Pure Trust Organizations ("PTOs").[7]  See Tilga PSR ¶ 10, at 7.  Tilga began purchasing entities from

---

video links, permitting personal computers to act as video-phones or video-conference stations.  See
Webcam, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Webcam (last visited October 28, 2011).

[5]CTC marketed their services and products as a means of providing privacy and asset
protection.  See Tilga PSR ¶ 11, at 8.  CTC described privacy as "a means to get assets out of your
name" and asset protection as "a method to owe more than the asset is worth."  Tilga PSR ¶ 11, at
8.  The CTC provided clients with documentation from the Internal Revenue Service ("IRS") that
Pure Trust Organizations ("PTOs") were considered legal, even though they did not have to file
income tax returns.  Tilga PSR ¶ 11, at 8.  When a client purchased a CTC product, such as a Pure
Trust Organization, the client would receive the original documents, and CTC would inform the
client that the documents should be stored away from the client's personal residence.  See Tilga PSR
¶ 13, at 8.  This off-site storage occurred because if the IRS were to locate the documents, it would
confirm that the PTOs were an alter ego of the client who purchased the product.  See Tilga PSR ¶
13, at 8.  The Director of Operations of CTC from 1998 to 2003, Wayne C. Rebuck, knew that the
majority of pure trusts sold by CTC were used in an abusive manner, wherein individuals "evaded
and defeated taxes."  Tilga PSR ¶ 14, at 8-9.

[6]Although it is unclear whether the CTC still operates as an organization, the PSR refers to
it in the past tense, and it appears that CTC's Director of Operations, Wayne C. Rebuck, has been
involved in this and other criminal prosecutions.  See Tilga PSR ¶ 15, at 9 ("Rebuck was able to
identify Carolynne Tilga and Michael Chandler as individuals who met with representatives from
CTC to purchase trusts and foreign companies."); United States v. Anthony, 545 F.3d 60, 63 n.4 (1st
Cir. 2008)("Pursuant to an agreement with the government [Wayne] Rebuck testified at Anthony's
trial.").

[7]The PSR notes:

A Pure Trust Organization (PTO) has been defined as a common law contract in trust
form.  The Pure Trust is a contract at common-law in equity created in trust form.
Unlike the Trust, the PTO receives the assets by exchange, meaning there is a full and
adequate exchange for the assets.  In other words each party gives something and
receives something in return, and the agreement has a stipulated duty to perform that
all parties must adhere to.  The Exchanger exchanges the assets to the Trust for Trust
Certificate Units ("TCU's").  The Creator appoints at least two Trustees to manage
the trust.  The Trustees can appoint a General Manager to oversee the day-to-day
business activities of the Trust.  The Exchanger has no control over the Trustees, the

CTC around April 1998.  See Tilga PSR ¶ 16, at 9; Tilga's Sentencing Memo. at 7.  Each of these entities was a "business" that controlled Tilga's internet sites, her homes, and her vehicles.  Tilga PSR ¶ 16, at 9.  Between 1998 and 2003, Tilga purchased the following entities from CTC: (i) Cabernet Financial, 1998; (ii) Worldwide Communications, 1998; (iii) General Management Services, 1998; (iv) Bressingham Investments, 1998; (v) Astra Management, 1999; (vi) Vantage Global, 2001; (vii) Batavia Guild Group, 2002; (viii) Triad Universal, 2002; (ix) Alsacia Marketing Services, 2002; and (x) Enchantment Property Management, 2003).  See Tilga PSR ¶ 16, at 9-10.

Tilga requested that the revenue from her Canadian business be generated to Cabernet Financial, which used an offshore trust account.  See Tilga PSR ¶ 18, at 10.  Tilga paid no taxes on her share of the revenues received from her Canadian business.  See Tilga PSR ¶ 18, at 10; Gov't Sentencing Memo. at 2.  Tilga then transferred funds from Cabernet Financial to various other entities purchased from CTC, which were formed to allow Tilga to purchase real estate and vehicles. See Tilga PSR ¶ 18, at 10; Gov't Sentencing Memo. at 2.

An IRS investigation revealed that Tilga and Chandler used the CTC trusts and offshore companies to purchase assets and set up new offshore accounts.  See Tilga PSR ¶ 19, at 10. Between 1999 and 2004, Tilga wired nearly $8.7 million (USD) into the United States from her offshore accounts, but her tax returns usually reported less than $75,000.00 (USD) in income per

---

business of the Trust or the income stream.  The Trustees are in total control and the Exchanger has no reversionary interest in the Trust.  This entity has the substance of a contract and the form of a trust.

Tilga PSR ¶ 10, at 7-8.  The IRS states that the term "pure trust" does not appear in the Internal Revenue Code and that "[w]hatever the name of the arrangement . . . the taxation of the entity must comply with the requirements of the Internal Revenue Code."  Abusive Trust Tax Evasion Schemes - Special Types of Trusts, INTERNAL REVENUE SERVICE, http://www.irs.gov/businesses/small/article/0,,id=106553,00.html (last visited October 21, 2011).

year.  See Tilga PSR ¶ 19, at 10.  Tilga used those funds to purchase expensive real estate in New Mexico, Colorado, and Hawaii.  See Tilga PSR ¶ 19, at 10-11.  Chandler assisted Tilga in wiring money to and from the accounts.  See Tilga PSR ¶ 22, at 13; Gov't Sentencing Memo. at 2-3.

For the years 1999 to 2004, Tilga failed to report $5,201,064.00 (USD) in taxable income. See Tilga PSR ¶ 25, at 14.  Additionally, neither Tilga nor the vast number of CTC entities that she owned filed tax returns.  See Tilga PSR ¶ 26, at 14.  Accordingly, the IRS calculated the additional taxes due and owing for those years was $1,937,272.00 (USD).  See Tilga PSR ¶ 26, at 15.  The United States and Tilga calculated the additional taxes due and owing for those years as a minimum of $1,735,025.00 (USD).  See Tilga Plea Agreement ¶¶ 6, 13, at 3, 11; Tilga PSR ¶ 5(f), at 5.

In 2005, the IRS began its investigation of Tilga.  See Tilga's Sentencing Memo. at 8.  In August 2009, Tilga filed tax returns in the Dominion of Canada for business income earned in each of the years 1999 to 2004.  See Gov't Sentencing Memo. at 4.  Tilga provided this information to the IRS in April 2010.  See Gov't Sentencing Memo. at 4.  The Canadian Revenue Agency ("CRA") sent Tilga a notice on November 19, 2010, stating that she owed $7,424,514.40 (Canadian Dollars) in taxes on her Canadian income.  See Tilga PSR ¶¶ 82-83, at 43; Gov't Sentencing Memo. at 4. On April 15, 2010, Tilga attempted to file a notice of claim with the IRS, stating that she was entitled to a credit on her 1999 taxes for taxes owed to the Canadian government for that year.  See Gov't Sentencing Memo. at 4.  The IRS accepted the notice, but did not consider the notice to have been "filed" and did not process it.  Gov't Sentencing Memo. at 4.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Tilga and Chandler for a <u>Klien</u> conspiracy[8] to defeat the

---

[8]A conspiracy to defeat the IRS' lawful function and victimize the IRS is known as a <u>Klein</u> conspiracy.  See <u>United States v. Adkinson</u>, 158 F.3d 1147, 1154 (11th Cir. 1998)(citing <u>United</u>

administration of the tax laws of the United States during the period 1998 to 2006 in violation of 18

U.S.C. § 371 and with tax evasion for the years 1999 to 2004 in violation of 26 U.S.C. § 7201.  See

Redacted Indictment, filed April 9, 2009 (Doc. 2)("Indictment").  In post-Indictment negotiations

with the United States, Tilga asserted that the Internal Revenue Code permitted her to file amended

United States tax returns claiming foreign tax credits for the years 1999 to 2004, because there is

a special ten-year statute of limitations for foreign tax credits.  See Gov't Sentencing Memo. at 3.

Tilga argued that, because Canadian taxes are generally higher than United States taxes, the foreign

tax credit would wipe out the United States tax deficiency.  See Gov't Sentencing Memo. at 3.

On January 6, 2011, the United States entered into plea agreements with Tilga and Chandler.

See Tilga Plea Agreement at 1; Plea Agreement at 1, filed January 6, 2011 (Doc. 128)("Chandler

Plea Agreement"); Gov't Sentencing Memo. at 5.  Tilga and Chandler both pled guilty to Count One

of the Indictment, charging a violation of 18 U.S.C. § 371 -- the Klein conspiracy.  See Tilga Plea

Agreement ¶ 3, at 2; Chandler Plea Agreement ¶ 3, at 2.  Tilga admitted the salient facts alleged in

the conspiracy count of the Indictment: (i) that she failed to report income from her various

businesses on her tax returns; (ii) that she entered into an agreement with CTC to defraud the United

States; and (iii) that she intended to conceal her Canadian source of income and defraud the United

States.  See Gov't Sentencing Memo. at 6; Tilga Plea Agreement ¶ 8(a)-(h), at 3-7.

In the Plea Agreement, the parties stipulated to the calculation of the amount of tax loss.

10.    The United States and the Defendant stipulate as follows:

---

States v. Klein, 247 F.2d 908 (2d Cir. 1997)).  To show a Klein conspiracy the United States  must
show not only (i) the requisite act of a failure to properly report income, but also (ii) an agreement
between at least two conspirators to impede the IRS' functioning and (iii) knowing participation in
such a conspiracy.  See United States v. Adkinson, 158 F.3d at 1153; United States v. McKee, 506
F.3d 225, 238 (3d Cir. 2007).

a.      For purposes of the advisory United States Sentencing Guidelines, the tax loss for the tax year ending on December 31, 1998, was $23,200.00.

b.      The Defendant believes in good faith, relying on the advice of experienced and skilled tax counsel, that she has a foreign tax credit available to her under Title 26, United States Code, Sections 901 and 6511 and applicable regulations, for taxes accrued or actually paid to a foreign country, and that such foreign tax credit would eliminate her liability for federal income taxes in the United States of America for the remaining years of the conspiracy to which she is pleading guilty, that is, the tax years ending on December 31, 1999, through December 31, 2004, inclusive. The Defendant has elected to forego pursuit of the foreign tax credit and instead pay federal income taxes that may be due and owing in the United States of America. The government does not agree with the Defendant concerning the availability and/or applicability of such foreign tax credit on the facts of the present case, as the Defendant has not actually paid the foreign taxes. The government agrees, however, that the Defendant's decision to pay the United States income taxes should not put her in a worse position for purposes of calculating her relevant conduct under the advisory United States Sentencing Guidelines than had she paid the foreign taxes. The parties accordingly stipulate, for relevant conduct purposes, that the tax loss from the conspiracy to which the Defendant is pleading guilty is limited to the $23,200.00 set out in ¶ 10(a), above.

Tilga Plea Agreement ¶ 10(a)-(b). The Chandler Plea Agreement makes the same stipulation, except that the tax loss is calculated as $23,300.00. See Chandler Plea Agreement ¶ 9(a), at 5.[9]

---

[9]The parties calculated the tax loss based on the following information: (i) Tilga wired $186,982.50 (USD), income from one of her Canadian businesses, to Tierra del Taos Title Co. for the purchase of a home on September 10, 1998; (ii) Tilga had previously invested $50,000.00 (USD) in Tierra del Taos; and (iii) Tilga had loaned approximately $20,252.00 (USD) to the company. See Gov't Sentencing Memo. at 15 n.13. Thus, after deducting the $70,252.00 that Tilga was entitled to recover before being taxed, the remaining income was $116,730.50 (USD). See Gov't Sentencing Memo. at 15 n. 13. That income should have been taxed at the then-prevailing long-term capital gain rate of twenty percent. See Gov't Sentencing Memo. at 15 n.13. Accordingly, the tax losses were approximately $23,346.10 (USD). See Gov't Sentencing Memo. at 15 n.13. The Tilga Plea Agreement, however, stipulates that the tax loss is $23,200.00 (USD). See Tilga Plea Agreement ¶ 10(a), at 7. Pursuant to U.S.S.G. § 2T4.1(D), all tax losses greater than $12,500.00 but less than $30,000.00 result in a base offense level of 12. See U.S.S.G. § 2T4.1(D); Tilga PSR ¶ 38, at 19. Thus, whether the tax loss is $23,300.00 (USD) or $23,200.00 (USD) does not change the base

On August 9, 2011, in compliance with rule 32 of the Federal Rules of Criminal Procedure, Tilga submitted her objections to the PSR to the United States Probation Office ("USPO"). Tilga's Sentencing Memo. at 1. Tilga contemporaneously submitted these objections to the United States Attorney's Office for the District of New Mexico ("USAO"). See Tilga's Sentencing Memo. at 1 n.2. Chandler also filed his objections to the PSR on August 9, 2011. See Defendant Michael Chandler's Objection to the Pre-Sentence Report, filed August 9, 2011 (Doc. 152)("Chandler Objection"). Chandler objects to the first sentence of paragraph 22 of the PSR, which states "Chandler was also known to assist [in] wiring money to and from the accounts." Chandler Objection at 1-2. See Chandler PSR ¶ 22, at 9. Chandler argues that there is no evidence that he wired money to and from accounts. See Chandler Objection at 1-2. The USPO responded to Tilga's objections on August 23, 2011, acquiescing on a few of the objections and rejecting the remainder. See Tilga's Sentencing Memo. at 1.

On August 23, 2011, Chandler filed his sentencing memorandum. See Chandler's Sentencing Memo. at 1. Chandler argues that he merits a sentence of probation based on: (i) his history and characteristics; (ii) that his crime constitutes aberrant behavior; (iii) the restitution he and Tilga have paid; and (iv) his family ties and responsibilities. See Chandler Sentencing Memo. at 1-9. Additionally, Chandler argues that probation would be a reasonable sentence pursuant to the 18 U.S.C. § 3553(a) factors. See Chandler Sentencing Memo. at 9-10.

On September 2, 2011, the United States responded to Chandler's objection. See Government's Response to Defendant Michael Chandler's Objection to Pre-Sentence Report, filed September 2, 2011 (Doc. 157)("Response"). The United States asserts that the PSR does not state

---

offense level. The Court will, however, use the more accurate stipulated tax loss, agreed to in the Chandler Plea Agreement -- $23,300.00 (USD). See Chandler Plea Agreement ¶ 9(a).

that Chandler wired any funds; rather, the PSR states that he assisted in wiring such funds.  See Response at 1.  The United States also argues that, in his Plea Agreement, Chandler conceded that he assisted in using the offshore bank accounts and wiring funds.  See Response at 2; Chandler Plea Agreement at ¶ 7(a), at 3 ("In 1998 or 1999, Carolynne Tilga requested my assistance in using a number of off-shore trusts through which we would move money she earned in Canada to purchase properties in the United States.").

On October 6, 2011, Tilga filed her sentencing memorandum and objections to the PSR.  See Tilga's Sentencing Memo. at 1.  In her memorandum she raised six objections to: (i) the calculation of tax loss based on any figure other than the $23,200.00 (USD) figure set out in the Plea Agreement; (ii) the suggestion in the PSR that the conspiracy involved "sophisticated means"; (iii) the PSR's failure to acknowledge the advantages the United States obtained from the Plea Agreement; (iv) the PSR's failure to explicitly recognize that the guidelines are advisory; (v) the PSR's failure to recognize that there are valid bases for a downward variance or downward departure from the guidelines sentencing range; and (vi) the PSR's failure to accord sufficient weight to Tilga's civil liability, liability to the Canadian government, and liability for Foreign Bank and Financial Account Report penalties ("FBAR")[10] when calculating Tilga's ability to pay a fine. See Tilga's Sentencing Memo. at 4.  Tilga maintains that she could have "eviscerated the federal income tax evasion charges lodged against her by amending her federal income tax returns before trial, taking the Foreign Tax Credit, and eliminating any tax deficiency."  Tilga's Sentencing Memo.

---

[10]Tax Form TD F 90-22.1, the "Report of Foreign Bank and Financial Accounts," is known as the "FBAR."  In re M.H., 648 F.3d 1067, 1070 (9th Cir. 2011).  The United States may seek to enforce civil penalties for failure to report an interest in a foreign bank account, as 31 U.S.C. § 5314 requires.  See United States v. Williams, No. 09-437, 2010 WL 2842931, at *1-2  (E.D. Va. Mar. 19, 2010).

at 9 (citing 26 U.S.C. §§ 901, 6511; United States v. Cruz, 698 F.3d 1148, 1150-51 (11th Cir. 1982)). Tilga argues that, because she could have avoided most of the tax loss through the foreign tax credit, the Plea Agreement's tax loss calculation is correct and that the Court should reject "the alternative and speculative tax loss calculations set out in the PSR predicated on a purportedly larger tax loss amount." Tilga's Sentencing Memo. at 10. Tilga asserts that her conduct did not involve any special complexity or intricacy, and that the sophisticated means were not of her creation. See Tilga's Sentencing Memo. at 11. Tilga further asserts that under 18 U.S.C. § 3553(a), the Court should downwardly depart or vary from the guidelines range to impose a non-custodial sentence. See Tilga's Sentencing Memo. at 12-19. Finally, Tilga argues that whether the Court should impose a fine on Tilga is committed to the Court's discretion. See Tilga's Sentencing Memo. at 20.

On October 8, 2011, the United States filed its sentencing memorandum. See Gov't Sentencing Memo. at 1. The United States argues that the Court should accept the non-binding stipulated loss amount in this case, because it was the product of lengthy, intensive negotiations between the parties, and the United States' decision to compromise was predicated on a review of its ability to prove a tax deficiency were Tilga to raise her foreign tax credit defense. See Gov't Sentencing Memo. at 10. The United States asserts that "[i]t is the position of the United States that a taxpayer cannot defeat a tax prosecution by amending her returns post-Indictment," but goes on to state that it calculated the amount of loss in the Plea Agreement only for the losses in 1998 because of "the risk that the tax evasion counts for 1999 to 2004 may have fallen" to the post-Indictment foreign tax credit defense Tilga planned to assert. Gov't Sentencing Memo. at 11, 15. The United States specifically notes that the Plea Agreement avoids "the risk of generating adverse legal precedent with respect to the defendants' proposed use of the foreign tax credit." Gov't Sentencing Memo. at 16. The United States argues that the Court should impose a sentence at the

top of the guidelines range on Tilga, because her conduct is "the most egregious conceivable for similarly situated offenders, motivated . . . by sheer greed in the face of conspicuous wealth."  Gov't Sentencing Memo. at 18.  The United States asserts that a departure or variance would be inappropriate, because the facts Tilga presents -- that she is a mother and a first-time offender -- do not distinguish her from any other defendant.  See Gov't Sentencing Memo. at 18.  Finally, the United States contends that the Court should impose a substantial fine on Tilga.  See Gov't Sentencing Memo. at 19.

The Court held an evidentiary hearing on Thursday, October 13, 2011.  Tilga pointed the Court to a recent case from the United States Court of Appeals for the Tenth Circuit, United States v. Hoskins, 654 F.3d 1086 (10th Cir. 2011), which held that a sentencing court may consider unclaimed tax deductions when calculating tax loss.  See Transcript of Hearing at 4:14-20 (October 13, 2011)(Theus)("Tr.").[11]  Tilga stated that her argument is based on the United States Court of Appeals for the Eleventh Circuit's decision in United States v. Cruz.  See Tr. at 5:17-19 (Theus). The Eleventh Circuit, Tilga asserted, held that, when a defendant has firm tax assessments from a foreign government and attempts to take advantage of the foreign tax credit before trial, there is "a viable basis for dismissal or defeat of the tax evasion charges."  Tr. at 6:1-5 (Theus).  Tilga further asserted that the foreign tax credit is unique, because a taxpayer has up to ten years to take advantage of the credit.  See Tr. at 6:5-7 (Theus).

The United States asserted that the distinction between the defendant in United States v. Cruz and in this case is that the defendant in United States v. Cruz did not address his tax liability under the foreign tax credit before trial while Tilga did.  See Tr. at 7:1-12 (Gerson).  Under United States

---

[11]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

v. Cruz, the United States concedes that there is "a colorable argument to be made." Tr. at 7:23-25 (Gerson). The United States clarified, however, that it is not conceding as a matter of law that Tilga may defeat her tax deficiency post-Indictment through the foreign tax credit. See Tr. at 8:1-2 (Gerson). Taking Tilga's argument at face value, the United States contended that Tilga would still be liable for the first year of the conspiracy, 1998, and, therefore, the United States used the tax losses for that year for the purposes of the guideline offense level calculation. See Tr. at 8:3-12 (Gerson).

The Court expressed concern whether it has authority to avoid the legal issue and accept the party's stipulation as to the law. See Tr. at 10:12-17 (Court). The United States responded that it is not stipulating that the law allows Tilga to make a post-Indictment adjustment to her tax liability through the use of the foreign tax credit. See Tr. at 10:18-22 (Gerson). Instead, the United States asserted that it recognizes that Tilga raises a colorable question and that "[w]e were trying to avoid the situation in which a court of the United States held that a defendant could make use of the foreign tax credit in the way that Tilga wished to use it in this case." Tr. at 11:1-4 (Gerson). The United States agreed that the stipulation turned on the parties' reading of United States v. Cruz being correct. See Tr. at 11:7-14 (Court, Gerson).

The Court also observed that, if it either sustains or overrules the objection, the Court will be implicitly deciding whether it agrees with the holding of United States v. Cruz or the parties' construction of that case. See Tr. 12:1-6 (Court). The United States responded that the calculation of the tax deficiency is a mixed question of law and fact. See Tr. 12:10-12 (Gerson). The United States also repeated that it is not the United States' position that a defendant may make such use of the foreign tax credit. See Tr. 12:24-13:1 (Gerson). It stated that well-developed case law exists supporting the proposition that a taxpayer may not address her tax deficiency post-Indictment. See

Tr. at 13:19-14:2 (Gerson).  The United States indicated that its concern was that the cases do not address the specific question of "ex-post facto correction of tax returns . . . through the use of the foreign tax credit."  Tr. at 14:3-5 (Gerson).  The United States argued that the USPO and the PSR adopted the stipulated tax loss.  See Tr. at 15:21-16:3 (Gerson).  The Court pointed out, however, that the USPO used the stipulated tax loss, but recognized its disagreement with that calculation, and the United States agreed that the Court had correctly described the USPO's position.  See Tr. at 16:8-22 (Court, Gerson).

The Court also offered Chandler the opportunity to speak on the issue of tax loss.  See Tr. at 17:9-11 (Court).  Chandler proposed presenting an expert witness that Chandler and Tilga subpoenaed should the Court have concerns about the foreign tax credit.  See Tr. at 17:12-18:3-5 (Court, Johnson, Theus).  The witness, Jeffrey Rubinger, was proposed as a specialist in international tax law who currently works as an accountant at KPMG and, before his current employment, was a partner at Holland & Knight LLP in its Fort Lauderdale, Florida office.  See Tr. at 18:8-11 (Theus).  Mr. Rubinger is also an adjunct professor at the University of Miami School of Law and has written on the subject of international tax law.  See Tr. at 18:11-15 (Theus).  Tilga stated that it would be productive to hear Mr. Rubinger's testimony on the foreign tax credit.  See Tr. 20:14-15 (Theus).  The United States asked whether the nature of Mr. Rubinger's testimony would be factual or legal, and stated that it would object if his testimony concerned the application of the law.  See Tr. at 20:18-23 (Gerson).  The Court stated that it would hear Mr. Rubinger's testimony and that if the United States had specific objections, the Court would hear them as they arose.  See Tr. at 20:24-21:2 (Court).

Mr. Rubinger testified that, as a partner at Holland & Knight, he provided representational services to Tilga, including analyzing the foreign tax credit issue.  See Tr. at 22:11-23 (Theus,

-14-

Rubinger).  Mr. Rubinger stated that, when he looked at the facts of Tilga's case, he understood that the income was from foreign sources, and that he discussed the special rules that apply to the foreign tax credit under the Internal Revenue Code.  See Tr. at 23:3-7 (Rubinger).  Mr. Rubinger explained that there is a ten-year statute of limitations to claim a foreign tax credit and that, if the credit is claimed within the ten-year period, it "relates back" to when the tax accrued.  Tr. at 23:7-11 (Rubinger).  Relating his testimony to Tilga, Mr. Rubinger stated that, if Tilga claimed the foreign tax credit within the statute of limitations for the years 1999 to 2004, she could "eliminate any deficiency for civil and criminal purposes."  Tr. at 23:19-24:3 (Rubinger).  Mr. Rubinger asserted that the Canadian government assessed tax liability of $7 million (CAD) in 2010 and that the amount has not been released, discharged, or abated in any way.  See Tr. at 24:11-25 (Rubinger, Theus).  Mr. Rubinger further asserted that, Title 26 of the Internal Revenue Code requires that foreign tax credits relate back retroactively such that for civil purposes Tilga would have no deficiency.  See Tr. at 25:8-14 (Rubinger).  He commented that, if there is no civil tax deficiency, then there cannot be a criminal tax deficiency.  See Tr. at 25:8-14 (Rubinger).  Mr. Rubinger also referred the Court to Boulware v. United States, 552 U.S. 421 (2008), as support for his position.  See Tr. at 25:16-18 (Rubinger).

Chandler's counsel, Erlinda O. Johnson, also questioned Mr. Rubinger concerning the foreign tax credit.  See Tr. at 25:24 (Johnson).  Mr. Rubinger clarified that there are cases which address a net-operating loss, where taxpayers have a "three year carry back," and that courts have not allowed such losses to eliminate tax deficiencies post-Indictment because the net operating loss does not relate back.  Tr. at 26:20-27:6 (Rubinger).  Mr. Rubinger stated that relation back under the foreign tax credit is mandatory and that its purpose is to alleviate double taxation.  See Tr. 27:7-19 (Johnson, Rubinger).  "When a United States taxpayer is earning income [in] a foreign country [and]

-15-

the foreign countr[y] taxes the income . . . the whole point [of the foreign tax credit] is to not allow the United States to tax the same income."  Tr. at 27:13-19 (Rubinger).  Mr. Rubinger went on to explain that "the rules work even though a United States individual taxpayer is typically on a cash method, which means that [their] income is taxable when it's received . . . [and] allow[s] individual taxpayers to apply the foreign tax credits on an accrual basis."  Tr. at 28:1-9 (Rubinger).  "So the Canadian tax credits accrued each [year] when they were owed; despite the fact that they may not have been paid, they were owed to Canada on the accrual method."  Tr. at 28:10-12 (Rubinger).  Mr. Rubinger stated that, "whether she paid them or not, under the accrual method of claiming the foreign tax credit she would get a retroactive tax credit."  Tr. at 28:16-18 (Rubinger).

The United States then cross-examined Mr. Rubinger.  Responding to a question whether any federal court had dismissed an indictment on the grounds that a taxpayer, post-indictment, had paid taxes to a foreign sovereign, Mr Rubinger agreed that no such federal decision existed.  See Tr. 29:8-14 (Gerson, Rubinger).  Expanding on his answer, Mr. Rubinger explained that the decision in United States v. Cruz comes very close to this holding, but in that case, the facts were different because the defendant had not filed returns before trial.  See Tr. 29:14-23 (Rubinger).  Mr. Rubinger agreed that it would be fair to say that Tilga's defense is predicated on the reasoning of United States v. Cruz, and not on the holding of that case.  See Tr. at 29:24-30:2 (Gerson, Rubinger).  He asserted that Tilga's defense is based on the Internal Revenue Code, which establishes that the foreign tax credit relates back, and that this retroactivity is what the Eleventh Circuit, in United States v. Cruz, held could preclude criminal liability pre-trial.  See Tr. at 30:2-8 (Rubinger).  Mr. Rubinger characterized the holding in United States v. Cruz as accelerating the expiration of the statute of limitations for claiming the foreign tax credit to the period before trial and added that the "case was highly criticized for that analysis."  Tr. at 30:13-15 (Rubinger).  Mr. Rubinger agreed that, although

the Internal Revenue Code says up to ten years, the judicial authority puts the expiration of the statute of limitations earlier if a criminal tax prosecution is implemented. See Tr. at 30:22-31:1 (Gerson, Rubinger).

In Tilga's re-direct, Mr. Rubinger stated that all the returns were prepared and the money was in the trust account ready to be paid before trial such that she was poised to exercise the foreign tax credit before it would expire under United States v. Cruz. See Tr. at 31:8-11 (Theus, Rubinger). The Court asked the United States to clarify the point of its questions regarding the statute of limitations for the foreign tax credit. See Tr. at 32:2-3 (Court). The United States responded that it was attempting to show that, although the Internal Revenue Code says the period is ten years, courts have not always applied that time period. See Tr. at 32:4-33:15 (Gerson, Rubinger). The United States reiterated that its position has always been that "a taxpayer may not fix the commission of a crime after the crime [has] been completed." Tr. at 33:19-25 (Gerson). The United States admitted that, had it not entered into this stipulation, it would be arguing on the other side of this issue -- that the total tax loss should be $1,735,025.00 (USD) -- and agreeing with the USPO. See Tr. at 34:7-21 (Court, Gerson). The United States stated that is the United States' legal position in this case that "this is an open question of law which we recognize we would have stood some risk of losing had we gone to trial." Tr. at 34:22-25 (Gerson).

The Court also asked the United States to explain what the criticism of the holding in United States v. Cruz has been. See Tr. at 35:12-15 (Court). The United States responded that it understood that Mr. Rubinger was referencing the position that the Internal Revenue Code is absolute in its position and "when the code says ten years it's ten years," when he referenced criticism. Tr. at 35:17-20 (Gerson). Expanding on this remark, the United States explained that the criticism on the part of tax professionals is that the United States v. Cruz decision violates the

-17-

Internal Revenue Code.  <u>See</u> Tr. at 35:20-21 (Gerson).  The United States asserted that "what the court itself said in <u>Cruz</u> [was] that they need to make decisions that are practical and attempt to fit the best interests of the United States over all and [not just] follow[] lockstep with the words of the statute."  Tr. at 35:21-25 (Gerson).  Mr. Rubinger stated that there is no provision in the Internal Revenue Code that allows for the acceleration of the ten-year period for the foreign credit.  <u>See</u> Tr. at 38:5-9 (Johnson, Rubinger).

Responding to Tilga's second objection, to the PSR's reference to sophisticated means, the United States asserted that the Plea Agreement stipulated that the sophisticated-means enhancement would not apply to Tilga.  <u>See</u> Tr. at 39:3-5 (Gerson).  The United States explained that it believed that the sophisticated-means enhancement would apply to CTC, and its officers or employees, but not to a customer of CTC like Tilga.  <u>See</u> Tr. at 39:7-13 (Gerson).  The Court asked whether Tilga used business entities, wired offshore accounts, and used shell companies to hide her income, and the United States admitted that she had.  <u>See</u> Tr. at 40:1-5 (Court, Gerson).  The United States said that it agreed to the stipulation, because Tilga was buying a product from another corporation.  <u>See</u> Tr. at 40:5-11 (Court, Gerson).  In response to the Court's questioning, the United States admitted that PTOs are sophisticated means, and that it was unaware of any reported opinion which drew a distinction between the seller and a customer in terms of sophisticated means.  <u>See</u> Tr. at 40:14-41:4 (Court, Gerson).

Tilga also argued that she did not employ sophisticated means to commit tax evasion.  Tilga referred the Court to the argument in her sentencing memorandum and stated that the analysis looks not just to the means a defendant employs, but to "the context of the particular offense or offense[s] being examined."  Tr. at 41:8-17 (Theus).  Tilga argues that her conduct is "par for the course" for the offense she committed, and asserted that several cases cited in her sentencing memorandum

involve foreign entities, foreign bank accounts, and substantial sums of money.  Tr. at 41:17-42:2 (Theus).  Tilga argued that, to qualify for the sophisticated-means enhancement, the conduct has to be "something beyond what happens in the garden variety type of offense" and that there is "nothing especially sophisticate[d] or complex about this matter."  Tr. at 42:13-25 (Theus).  Tilga agreed that CTC, in marketing and managing different product for their customers, engaged in sophisticated means, but asserted that there is a difference between those activities and the consumer who buys a product relying on CTC's representation about that product.  See Tr. at 43:13-20 (Theus).  Tilga also conceded that she had not found any cases supporting the distinction between a customer and a seller using sophisticated means.  See Tr. at 43:21-44:6 (Court, Theus).  Tilga contended that CTC had lawyers and accountants on staff who made representations to her about the acceptability of their products to the IRS.  See Tr. at 44:23-25 (Theus).  She asserted that sophisticated means requires "some deliberate or volitional activity on the part of the accused in terms of creation or management of these types of products."  Tr. at 45:1-6 (Theus).  Tilga maintained that, if the sophisticated-means enhancement applies every time some sophisticated means was used in connection to the offense, then a court could apply the enhancement to virtually any offense that might come before the court.  See Tr. at 45:6-9 (Theus).

Chandler also spoke, and supported the United States' position that Tilga did not employ sophisticated means, because she was no more than a customer who bought a product.  See Tr. at 45:16-19 (Johnson).  Chandler argued that it is the managers and directors of CTC who should have the sophisticated-means enhancement.  See Tr. at 45:19-23 (Johnson).  Chandler asserted that Tilga was a customer and that CTC sold her a bill of goods with the promise that they were completely legitimate.  See Tr. at 45:24-46:1 (Johnson).  Because CTC held Tilga's hand throughout the time period that she held the trusts and prided itself on the fact that its employees would serve as trustees,

Chandler argued that Tilga's actions do not qualify for the sophisticated-means enhancement. See Tr. at 46:1-6 (Johnson). Chandler further asserted that the customer is not involved in knowing the intricacies of the PTOs that were sold and, therefore, the sophisticated-means enhancement would apply to the individuals who managed the trusts or came up with the idea for the trust. See Tr. at 46:6-11 (Johnson). Conceding that at some point Tilga should have realized that her conduct was criminal, Chandler nonetheless argued that Tilga, when she bought the PTOs, was "basically [given] a handbook and . . . led by the hand [to] understand 'this is how you do this and you do this and you do that.'" Tr. at 46:12-24 (Johnson).

Additionally, the Court heard arguments on the stipulation in the Plea Agreement that Tilga was not the organizer, leader, or supervisor of the criminal activity. See Tr. at 48:12-19 (Court). The United States stated that Tilga is substantially less culpable than the people at CTC. See Tr. 48:22-24 (Court, Gerson). Chandler again pointed out, that both he and Tilga were sold a product, and did not start the PTOs. See Tr. at 49:11-14 (Johnson). The Court accepted the stipulation on the role adjustment, because "when we consider the entire criminal organization, I agree that she's substantially less culpable than the people at Commonwealth." Tr. at 49:16-20 (Court).

The United States also stated that it was the parties' position that neither Tilga nor Chandler "possessed any special skill with respect to tax law or with respect to taxes." Tr. at 50:1-4 (Gerson). It clarified that the United States' argument was not that Tilga does not have skills, because Tilga is highly educated, but that, she did not "victimize[] some other person by making use of these special skills." Tr. at 50:5-15 (Court, Gerson). The United States asserted that Tilga has special skills with respect to marketing and collecting fees for services providers, but that she does not have any special skills that relate to taxes or tax liability. See Tr. at 51:2-6 (Gerson). The Court agreed that the enhancement for use of a special skill is inappropriate and accepted the parties' stipulation

-20-

to that effect.  See Tr. at 52:5-13 (Court).

The Court expressed concern whether an obstruction enhancement was appropriate.  See Tr. at 52:14-21 (Court).  The United States asserted that, had it gone to trial, the United States would have called Grant Simmons, Tilga's former employee, and had him testify that Tilga came to his house and told him that she "was not going to take the fall for this."  Tilga PSR ¶ 40, at 21; Tr. at 52:22-25 (Gerson).  The United States argued that these actions show consciousness of guilt and "was being uttered to prevent the United States from carrying out an investigation in this case."  Tr. at 53:1-8 (Gerson).  Tilga stated that no admissible evidence would establish that she intended to obstruct or impede the administration of justice.  See Tr. at 53:10-13 (Theus).  Additionally, Tilga argued that Simmons would have been aggressively cross-examined and impeached.  See Tr. at 53:13-20 (Theus).  The United States admitted that, while it would have been able to establish that Tilga said those things to Simmons, it would not have been "able to establish by a preponderance of the evidence that that was reasonably likely to interfere with the investigation."  Tr. at 54:22-55:5 (Gerson).

Tilga stated that her objection to the PSR's failure to acknowledge the advantages that the United States received from the Plea Agreement had been addressed and was more appropriate for argument rather than inclusion in the PSR.  See Tr. at 57:21-58:3 (Theus).  Tilga admitted that her objection is moot to the extent that the information is presently before the Court through her sentencing memorandum.  See Tr. at 58:4-7 (Court, Theus).  Additionally, Tilga stated that her objection to the PSR's failure to acknowledge the advisory status of the guidelines had been satisfactorily addressed and included in the sentencing memorandum.  See Tr. at 58:12-59:2 (Court, Theus).

On October 31, 2011, Chandler's attorney wrote the Court regarding the standard of proof

and Sixth Amendment requirements for applying a sentencing enhancement.  See Letter from

Erlinda Johnson to the Court (dated October 31, 2011), filed October 31, 2011 (Doc. 164)("Letter").

Chandler requested that the Court accept the stipulations included in paragraph 9(b) of Chandler's

Plea Agreement  that Chandler's offense did not involve a breach of trust, a special skill,

sophisticated means, an aggravating role, or obstruction of justice.  See Letter at 1.  Chandler

focuses his discussion on U.S.S.G. § 2T1.1(b)(2)'s sophisticated-means enhancement.  See Letter

at 1-2.  Chandler points the Court to United States v. Lewis, 93 F.3d 1075 (2d Cir. 1996), which

applied the sophisticated-means enhancement but acknowledged that the enhancement "targets

conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than

a routine tax-evasion case." Letter at 1-2.  Chandler also cites United States v. Rice, 52 F.3d 843

(10th Cir. 1995), which reversed the application of the sophisticated-means enhancement where,

"[b]y using [several] corporations, Mr. Rice claimed to have paid withholding taxes he did not

indeed pay." Letter at 1-2.  Chandler argues that the "conduct of the defendants [in this case] was

more similar to Mr. Rice's conduct because the defendants herein merely requested, of others, the

movement of moneys from one account to a different account." Letter at 2.  Chandler also submits

that, pursuant to Blakely v. Washington, 542 U.S. 296 (2004) and United States v. Booker, 543 U.S.

220 (2005), a sentence must be determined solely "by reference to 'facts reflected in the jury verdict

or admitted by the defendant,'" and that any other sentencing fact must be proved to a jury beyond

a reasonable doubt to a jury.  Letter at 2.

## LAW REGARDING CALCULATION OF TAX LOSS

The guidelines define "tax loss" for the purpose of sentencing defendants in U.S.S.G.

§ 2T1.1: "If the offense involved tax evasion or a fraudulent or a false return, statement, or other

document, the tax loss is the total amount of loss that was the object of the offense (i.e., the loss that

would have resulted had the offense been successfully completed)."  U.S.S.G. § 2T1.1(c)(1).  Under

this provision, tax loss "shall be treated as equal to 28% of the unreported gross income . . . , unless

a more accurate determination of the tax loss can be made."  U.S.S.G. § 2T1.1(c)(1), Note A.  The

United States bears the burden of proving the amount of tax loss arising from the defendant's illegal

acts, but under the guidelines, "neither the government nor the court has an obligation to calculate

the tax loss with certainty or precision."  United States v. Sullivan, 255 F.3d 1255, 1263 (10th Cir.

2001)(quotation omitted).

     **1.**     **Tenth Circuit Jurisprudence on Availability of Unclaimed Deductions.**

     In United States v. Spencer, 178 F.3d 1365 (10th Cir. 1999), the Tenth Circuit stated that

U.S.S.G. § 2T1.1 Note A's "more accurate determination" provision does not allow taxpayers "a

second opportunity to claim deductions after having been convicted of tax fraud."  178 F.3d at 1368.

The Tenth Circuit explained that, in calculating tax loss for the purpose of sentencing, "we are not

computing an individual's tax liability as is done in a traditional audit[, but r]ather we are merely

assessing the tax loss resulting from the manner in which the defendant chose to complete his

income tax returns."  United States v. Spencer, 178 F.3d at 1368.  Although the Tenth Circuit in

United States v. Spencer discussed the availability of unclaimed deductions when calculating tax

loss, the Tenth Circuit ultimately rejected the defendant's tax-loss estimate because it was not

supported by a "scintilla of competent evidence."  178 F.3d at 1369.

     In United States v. Hoskins, 654 F.3d 1086 (10th Cir. 2011), the Tenth Circuit again refused

to "squarely hold that unclaimed deductions can never be considered by a district court."  654 F.3d

at 1094.  The Tenth Circuit found that "the plain language of § 2T1.1 does not categorically prevent

a court from considering unclaimed deductions in its sentencing analysis."  United States v. Hoskins,

654 F.3d at 1094.  Instead, "§ 2T1.1 directs courts to calculate the tax loss that would have resulted

had the offense been successfully completed." United States v. Hoskins, 654 F.3d at 1094.  Thus, "the 'object of the offense' refers to the 'amount by which [a defendant] underreported and fraudulently stated his tax liability on his return.'"  United States v. Hoskins, 654 F.3d at 1094 (quoting United States v. Chavin, 316 F.3d 666, 677 (7th Cir. 2002)).  Addressing United States v. Spencer, the Tenth Circuit explained that the holding of that case still holds true where "a defendant offers weak support for a tax-loss estimate," because "nothing in the Guidelines requires a sentencing court to engage in the 'nebulous and potentially complex exercise of speculating about unclaimed deductions."  United States v. Hoskins, 654 F.3d at 1094 (emphasis original)(quoting United States v. Yip, 592 F.3d 1035, 1041 (9th Cir. 2010)).  The Tenth Circuit held, however, that "nothing in the Guidelines prohibits a sentencing court from considering evidence of unclaimed deductions in analyzing a defendant's estimate of the tax loss suffered by the government."  United States v. Hoskins, 654 F.3d at 1094-95(emphasis original).  "[A] court may exercise its discretion to consider additional evidence that could guide its findings on the losses to the government relevant to sentencing."  United States v. Hoskins, 654 F.3d at 1095.  The United States is not supposed to reap windfall gains as a result of tax evasion and cannot assert to have lost revenue it never would have collected had the defendant not evaded his taxes.  See United States v. Hoskins, 654 F.3d at 1095 (citing United States v. Gordon, 291 F.3d 181, 187 (2d Cir. 2002)).

In a footnote, however, the Tenth Circuit emphasized that § 2T1.1 "does not permit a defendant to benefit from deductions unrelated to the offense at issue."  United States v. Hoskins, 654 F.3d at 1095 n.9.  Thus, "unclaimed deductions for student loan interest or solar energy credits, for example, are not considered because they do not relate to the 'object of the offense' and are not relevant to restitution or guideline calculations for sentencing purposes."  United States v. Hoskins, 654 F.3d at 1095 n.9.

-24-

Chief Judge Briscoe wrote an opinion concurring in part and dissenting in part in United States v. Hoskins. Chief Judge Briscoe concurred with "the portions of the majority's opinion affirming Hoskins' conviction, the district court's ultimate finding regarding the amount of the tax loss, and the district court's application of the U.S.S.G. § 2T.1.1(b)(1) enhancement." United States v. Hoskins, 654 F.3d at 1100 (Briscoe, C.J., concurring in part and dissenting in part). She dissented with respect to the portions of the majority opinion "in which the majority takes the unnecessary step in announcing a rule permitting defendants in future cases to offer deductions they did not actually claim in order to establish a 'more accurate determination of the tax loss' under U.S.S.G. § 2T1.1(a)." United States v. Hoskins, 654 F.3d at 1100. Chief Judge Briscoe explained that, in her view, the majority opinion's rule on tax loss improperly complicates sentencing in tax cases, improperly characterizes the Tenth Circuit's holding in United States v. Spencer, and "essentially allows the defendant a 'do over.'" United States v. Hoskins, 654 F.3d at 1101-02.

### 2.    The Foreign Tax Credit.

26 U.S.C. § 901 provides that a United States taxpayer may claim a tax credit for the amount of any income taxes paid or accrued to any foreign country. See 26 U.S.C. § 901(a)-(b). Subsection (a) specifically notes that "[s]uch choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed." 26 U.S.C. § 901(a). Section 904 of Title 26 of the United States Code limits the total amount of credit that a United States taxpayer may take under § 901(a) and provides that "[t]he total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States . . . bears to his entire taxable income for the same taxable year." 26 U.S.C. § 904 (a). Furthermore, 26 U.S.C. § 905 states:

(B) Taxes subsequently paid.--Any such taxes if subsequently paid--

(i) shall be taken into account -- (I) in the case of taxes deemed paid under section 902 or section 960, for the taxable year in which paid (and no redetermination shall be made under this section by reason of such payment), and (II) in any other case, for the taxable year to which such taxes relate . . . .

26 U.S.C. § 905(c)(2)(B).

In another section of Title 26, Congress provides special rules relating to foreign tax credits.

See 26 U.S.C. § 6511(d).  26 U.S.C. § 6511(d)(3)(A) establishes a special statute of limitations with

respect to foreign taxes paid or accrued.  Subsection (d)(3)(A) provides:

If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country or to any possession of the United States for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 or the provisions of any treaty to which the United States is a party, in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 10 years from the date prescribed by law for filing the return for the year in which such taxes were actually paid or accrued.

26 U.S.C. § 6511(d)(3)(A).

The Tenth Circuit appears to have addressed the foreign tax credit only in a civil case, Tipton

& Kalmback v. United States, 480 F.2d 1118 (10th Cir. 1973).  Tipton & Kalmback v. United States

addressed a claim for refunds of federal income taxes paid in 1964 through 1966, and answered

questions relating to the determination of where services were performed.  See 480 F.2d at 1119,

1121.

The Eleventh Circuit, in United States v. Cruz, 698 F.2d 1148, held that a defendant in a tax

evasion case could not contend that the foreign tax credit wiped out the United States deficiency,

because the foreign tax liability had not been determined before trial.  See 698 F.2d at 1152.  The

Eleventh Circuit explained that, "[i]n the case of the foreign tax credit, the final event which fixes

the amount of the credit is the levy of the tax."  United States v. Cruz, 698 F.2d at 1151 (citing

United States v. Campbell, 351 F.2d 336, 338 (2d Cir. 1965)).  The Eleventh Circuit noted that, once

the liability becomes fixed, it "relates back" to the year in which it was levied.  United States v.

Cruz, 698 F.2d at 1151.  In reaching its holding and interpreting 26 U.S.C. § 905, the Eleventh

Circuit emphasized that, "we will not be constrained by intricate technicalities which would create

a haven for federal tax evasion."  United States v. Cruz, 698 F.2d at 1152.  The Eleventh Circuit

stated: "When interpreting statutes, we are required to give a practical interpretation which will not

produce an absurd result."  United States v. Cruz, 698 F.2d at 1152.

        The defendant in United States v. Cruz defended himself at trial on the theory that no tax

deficiency existed, because as a citizen of the Dominican Republic, a country which taxes income

earned worldwide, his tax liability to it had accrued.  See 698 F.2d at 1150.  In rejecting this

argument on appeal, the Eleventh Circuit commented:

>        [U]nder Cruz's interpretation, a taxpayer in his position could wait and pay no tax,
> either to the United States or the Dominican Republic until the United States
> authorities became aware of an irregularity in his tax return.  Once discovered, he
> could either pay or immediately admit the foreign tax and claim the retroactive
> United States tax credit under section 6511(d)(3), as an absolute defense.

United States v. Cruz, 698 F.2d at 1152.  Concerns with fraud and the six-year statute of limitations

on 26 U.S.C. § 7201 prosecutions were evident in the Eleventh Circuit's approach to its analysis.

See United States v. Cruz, 698 F.2d at 1152.  The defendant did not offer any proof that he had fixed

his foreign tax liability before trial.  See United States v. Cruz, 698 F.2d at 1152.  The Eleventh

Circuit upheld a jury instruction which required that the jury find that "all events have occurred

which fix the amount of the tax and determine the liability of the taxpayer to pay it."  United States

v. Cruz, 698 F.2d at 1150.

>        The practical effect of this decision means the tax evader can no longer play one
> government against the other to defeat an evasion prosecution . . . . It now means that
> when the government begins a section 7201 prosecution of a taxpayer who claims a

foreign tax credit under section 905, the government accelerates that time within which the taxpayer may exercise the right to fix the amount of the foreign tax liability and claim the foreign tax credit.

United States v. Cruz 698 F.2d at 1152.

## PROOF OF ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court of the United States reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment within the range prescribed by statute." 530 U.S. at 481. The Supreme Court cautioned, however, that the Constitution limits this discretion and that the Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington, 542 U.S. 296, 303 (2004)(emphasis omitted)(internal quotations and citations omitted). In United States v. Booker, the Supreme Court expanded its earlier holdings to apply to sentencing enhancements that exceeded maximum sentences under the sentencing guidelines. See 543 U.S. 220, 239 (2005)("Regardless of whether the legal basis of the accusation is in a statute or in guidelines promulgated by an independent commission, the principles behind the jury trial right are equally applicable.").

The Supreme Court in United States v. Booker found those provisions of the Federal Sentencing Reform Act of 1984 that made the guidelines mandatory, see 18 U.S.C. § 3553(b)(1), or which relied upon the guidelines' mandatory nature, see 18 U.S.C. § 3742(e), incompatible with

the Sixth Amendment, see United States v. Booker, 543 U.S. at 245.  Accordingly, the Supreme Court in United States v. Booker severed and excised 18 U.S.C. § 3553(b)(1) -- the portion of the federal sentencing statute that made it mandatory for courts to sentence within a particular sentencing guideline range -- from the remainder of the Act, thus "mak[ing] the Guidelines effectively advisory."  United States v. Booker, 543 U.S. at 245.  The Supreme Court's holding in United States v. Booker "requires a sentencing court to consider Guideline ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well."  United States v. Booker, 543 U.S. at 245-46.

The Supreme Court confirmed that an advisory guidelines system comports with the Sixth Amendment.  In Cunningham v. California, 549 U.S. 270 (2007), Justice Ginsburg, joined by the other four justices who had been part of the constitutional majority in United States v. Booker and Chief Justice Roberts, noted that, despite disagreement over the most appropriate method to remedy the mandatory Guidelines' constitutional infirmity, all nine justices that took part in the United States v. Booker decision agreed that "the Federal Guidelines would not implicate the Sixth Amendment were they advisory." Cunningham v. California, 549 U.S. at 285.  Not only did making the guidelines advisory remedy the Supreme Court's Sixth Amendment concerns, it seems to have alleviated the constitutional concerns regarding the appropriate burden of proof that existed under the mandatory system.  A person who is found guilty of a crime beyond a reasonable doubt is exposed to the maximum punishment the statute of conviction allows, rather than the maximum allowed under the Guidelines, and it is therefore constitutional to sentence the guilty defendant any where within the range based on facts proved only by a preponderance of the evidence.  See, e.g., Harris v. United States, 536 U.S. 545, 558 (2002)("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-

doubt components of the Fifth and Sixth Amendments.").

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker had not changed the district court's enhancement-findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant, Magallanez, guilty of conspiracy to possess with intent to distribute and to distribute methamphetamine. See 408 F.3d at 676. As part of its verdict, the jury, through special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on testimony of the various amounts that government witnesses indicated they had sold to the defendant -- attributed 1200 grams of methamphetamine to the defendant and used that amount to increase his sentence under the guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increased the defendant's guideline sentencing range from 63 to 78 months to 121 to 151 months. See United States v. Magallanez, 408 F.3d at 682-83. The Tenth Circuit stated that, both before and after Congress' passage of the Sentencing Reform Act, "sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the guidelines "effectively advisory," the Tenth Circuit in United States v. Magallanez reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before." 408 F.3d at 685 (internal citation omitted). In the Tenth Circuit's estimation, "the only difference is that the court has latitude, subject to reasonableness review, to depart from the resulting Guideline ranges." United States v. Magallanez, 408 F.3d at 85. Two years later, in United States v. Hall, 473 F.3d 1295 (10th

Cir. 2007), the Tenth Circuit confirmed its position in United States v. Magallanez and held that, in the context of sentencing enhancements, "Booker makes clear that judicial fact-finding by a preponderance of the evidence standard is unconstitutional only when it operates to increase a defendant's sentence mandatorily." 473 F.3d at 1312.

### LAW REGARDING U.S.S.G. § 3B1.3

U.S.S.G. § 3B1.3, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).
> .

U.S.S.G. § 3B1.3. Application Note 4 defines "Special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." U.S.S.G. § 3B1.3 cmt. n.4. The United States must satisfy two elements to meet § 3B1.3: (i) the defendant possessed a special skill or a position of trust; and (ii) the defendant used that skill or abused that position to significantly facilitate the commission or concealment of the offense. See United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998).

The Tenth Circuit recognizes that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill." United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762, at * 3 (10th Cir. Jan. 12, 1999)(table)(unpublished opinion). A special skill may also come from experience or from self-teaching. See United States v. Gandy, 36 F.3d 912, 914 (10th Cir. 1994). To apply a U.S.S.G. § 3B1.3 enhancement, the skill "'must be more than the mere

ability to commit the offense.'" United States v. Burt, 134 F.3d 997, 999 (10th Cir. 1998)(quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991)).  Additionally, there must be a "connection between the crime and the Defendant's special knowledge." United States v. Burt, 134 F.3d at 1000.

## LAW REGARDING U.S.S.G. § 2T1.1(b)(2)

U.S.S.G. § 2T1.1 addresses tax evasion specifically and subsection (b)(2) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels.  If the resulting offense is less than level 12, increase to level 12."  U.S.S.G. § 2T1.1(b)(2).  Application Note 4 provides that

> For the purposes of subsection (b)(2), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

U.S.S.G. § 2T1.1 cmt. n.4.

The Tenth Circuit first addressed the tax evasion enhancement for sophisticated means in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).  In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld."  52 F.3d at 845.  The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case."  United States v. Rice, 52 F.3d at 849.  The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid."  United States v. Rice, 52 F.3d at 849.  In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric."  United States v. Rice, 52 F.3d at 849.  In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit found that the district court's

application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect and that her case was not simply one of claiming to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

The Tenth Circuit has upheld the application of a sophisticated-means enhancement to a defendant who conducted seminars on avoiding tax liability, and "assisted in the preparation of tax returns that were false and fraudulent as to a material matter."  United States v. Ambort, 405 F.3d 1109, 1113 (10th Cir. 2005).  In United States v. Ambort, the Tenth Circuit found that there was ample evidence in the record to support a sophisticated-means enhancement, because the defendant's program was designed to provide a basis that someone could later articulate as to why they were entitled to the tax status they advanced and included discussions about what information should not be included in tax forms to avoid traceability.  See 405 F.3d at 1120.  Additionally, the United States Court of Appeals for the Sixth Circuit has upheld the imposition of a sophisticated-means enhancement where the defendant created and used fictitious trusts to hide assets from the IRS, even though the defendant was not a sophisticated businessman and no offshore trusts were involved.  See United States v. Schwartz, 408 F.App'x 868, 870 (6th Cir. 2010)(unpublished).  The United States Court of Appeals for the Seventh Circuit, in United States v. Minneman, 143 F.3d 1274 (7th Cir. 1998), held that the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income.  See 143 F.3d at 1283.

### LAW REGARDING U.S.S.G. § 3B1.1(a) AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's

offense level based on a defendant having played an aggravating role in the offense. Under § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." Lesser enhancements are specified for defendants who are "managers or supervisors" rather than organizers or leaders, and for defendants involved in smaller-scale criminal conduct. U.S.S.G. § 3B1.1(b)-(c). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1. "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1 cmt. n.3. "The [Sentencing] Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, backg'd.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4. The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)). The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has

also

> identified several factors which might indicate that a defendant exercised the requisite control over others, including that: other sellers worked for him, were recruited by him, or had their activities controlled by him; "he paid others for their efforts on behalf of the conspiracy;" "he restricted the people to whom other coconspirators could sell their drugs;" and "he controlled the manner of sales, set prices, or claimed the right to a larger share of proceeds." United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v. Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223.  "[A] role as a supplier of drugs to others, standing alone, is not enough," however, to justify a 4-level enhancement under § 3B1.1(a).  United States v. Sallis, 533 F.3d at 1223-24 (quotation omitted).

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct.  "Nothing in the Guidelines requires that an organizer must exercise some direction or control over underlings."  United States v. Valdez-Arieta 127 F.3d 1267, 1271 (10th Cir. 1997).  "As a result, a defendant may be punished as an organizer under § 3B1.1(c)[12] for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants."  United States v. Valdez-Arieta, 127 F.3d at 1272.

## LAW REGARDING U.S.S.G. § 3C1.1

U.S.S.G. § 3C1.1 states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct

---

[12] Section 3B1.1(c) applies to leaders, organizers, managers, or supervisors of organizations with less than five persons.  The only relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it seems, is the size of the organization.

related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The application notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. n.1.

The application notes to U.S.S.G. § 3C1.1 further state that the conduct that the Sentencing Committee believes warrant the upward adjustment include the following:

(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so . . . (d) destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so.

U.S.S.G. § 3C1.1, cmt. n.4(a) & (c).   In United States v. Farnsworth, 92 F.3d 1001, 1011 (10th Cir. 1996), the Tenth Circuit recognized that an attempt to influence a witness by instructing the witness to lie warrants an enhancement under U.S.S.G. § 3C1.1.  See 92 F.3d at 1011.  The Tenth Circuit remanded the case to the district court, however, because the district court did not make a specific finding as to the issue, instead doing no more than adopting "the analysis of the Probation Department as accurate and correct." United States v. Farnsworth, 92 F.3d at 1011.  In United States v. Yuselew, No. 09-1035, 2010 WL 3834418 (D.N.M. Aug. 5, 2010)(Browning, J.), the Court held that, "to warrant application of the § 3C1.1 enhancement, the defendant must have deliberately -- not accidentally, incidentally, or mistakenly -- done some act with the specific purpose of thwarting the investigation and prosecution."  2010 WL 3834418, at *12.  The Court also held that attempts to obstruct justice may be sufficient if the acts were of a kind that were likely to thwart the investigation and eventual prosecution.  See United States v. Yuselew, 2010 WL 3834418, at *13.

## ANALYSIS

The Court accepts the parties' stipulated calculation of tax loss, $23,300.00, and finds that the foreign tax credit may apply post-indictment. The Court also agrees with and accepts the parties stipulations in the Plea Agreements that neither Tilga nor Chandler's offenses involved a special skill, an aggravating role, or obstruction of justice. See Tilga Plea Agreement ¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5. The Court will sustain Tilga and Chandler's objections to the PSRs to the extent that the PSRs are contrary to these findings. The Court finds, however, that Tilga and Chandler used sophisticated means, as defined under U.S.S.G. § 2T1.1, and will reject the parties' stipulation to the contrary. See Tilga Plea Agreement ¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.

## I.    THE COURT WILL SUSTAIN THE OBJECTION TO THE PSR'S TAX LOSS CALCULATION.

The PSRs state:

> [T]he corresponding tax loss is $1,937,273. Based on the tax table, more than $1,000,000 but less than $2,500,000, in loss warrants a base offense level of 22. However, pursuant to information contained in the co-defendant's plea agreement, the parties stipulate that the total tax loss was $1,735,025.00, and, for relevant conduct purposes, the tax loss amount from the conspiracy to which the defendant is pleading guilty was $23,300.00. Pursuant to U.S.S.G. § 2T4.1(D) tax loss greater than $12,500 but less than $30,000 results in a base offense level of 12.

Tilga PSR ¶ 38, at 18-19; Chandler PSR ¶ 36, at 15. The Plea Agreements stipulate that "the tax loss from the conspiracy to which the Defendant is pleading guilty was $23,300.00." Chandler Plea Agreement ¶ 9(a), at 5. See also Tilga Plea Agreement ¶ 10(a), at 7.

Tilga argues that the principle that a court may consider a defendant's unclaimed deductions in its calculation of tax loss, established under United States v. Hoskins, applies with equal force to her case and the foreign tax credit. See Tilga's Sentencing Memo. at 9. Tilga asserts that, under

United States v. Cruz, she could have eliminated an essential element of the federal income tax evasion charges because the ten-year statute of limitations for the foreign tax credit had not yet expired at the time she fixed her Canadian tax liability.  See Tilga's Sentencing Memo. at 9-10. Tigla contends that the $23,200.00 (USD) tax loss stipulated in the Plea Agreement is the product of a compromise on the foreign tax credit issue and allowed the parties to avoid a lengthy trial as well as secure prompt payment to the United States.  See Tilga's Sentencing Memo. at 10.

The United States also asks the Court to use the $23,200.00 (USD)[13] figure as the amount of tax loss and states that the Plea Agreement was specifically designed to avoid a court determination of the applicability of the foreign tax credit.  See Gov't Sentencing Memo. at 10, 16. The United States maintains that its position is that a taxpayer cannot, through post-indictment amendment of her tax returns, defeat a tax prosecution.  See Gov't Sentencing Memo. at 11.  It cites United States v. Helmsley, 941 F.2d 71 (2d Cir. 1991), which establishes this principle in the context of a taxpayer's election of a depreciation method.  See Gov't Sentencing Memo. at 11 (citing United States v. Helmsley, 941 F.2d at 11).  The United States supports, however, Tilga's position and the stipulation in the Plea Agreement, which is contrary to the Department of Justice's official position. See Gov't Sentencing Memo. at 12-16.  The United States maintains that, under United States v. Cruz, there is a colorable argument that a "prosecution for tax evasion accelerates the time for fixing the amount of the foreign tax credit up until the time of trial" and that Tilga positioned herself to

---

[13]Although the United States asked the Court to accept the tax loss calculation, stipulated to in the Tilga Plea Agreement, of $23,200.00 (USD), the United States' calculations put the tax loss amount at $23,300.00 (USD) and the Chandler Plea Agreement stipulates to a tax loss of $23,300.00.  See Gov't Sentencing Memo. at 15 n.13; Chandler Plea Agreement ¶ 9(a), at 5. Because the United States stressed that Chandler should "be given the benefit of the same stipulated loss amount as to the tax loss," Chandler Plea Agreement ¶ 9(a), at 5, and because the $23,300.00 (USD) calculation is more accurate, the Court will treat the United States' and Tilga's requests as asking the Court to accept a stipulate tax loss of $23,300.00 (USD).

take advantage of the foreign tax credit.  Gov't Sentencing Memo. at 14-15 (citing <u>United States v.</u> <u>Cruz</u>, 698 F.2d at 1152).  Furthermore, the United States' sentencing memorandum suggests that "in considering the non-binding stipulated tax loss, the Court should consider a recent Tenth Circuit decision holding that a sentencing court does not abuse its discretion in considering well-supported but unclaimed tax deductions when calculating tax loss for the purposes of U.S.S.G. § 2T1.1." Gov't Sentencing Memo. at 16 (citing <u>United States v. Hoskins</u>, 654 F.3d at 1094-95).

At the hearing, Chandler agreed with Tilga and the United States that the tax loss should be $23,300.00 (USD) and offered to present Mr. Rubinger to help educate the Court on the foreign tax credit issue.  <u>See</u> Tr. at 17:12-25 (Johnson).

## A.   THE COURT WILL DECIDE WHETHER THE FOREIGN TAX CREDIT APPLIED POST-INDICTMENT.

At the hearing, the United States asserted that "[w]e were trying to avoid the situation in which a Court of the United States held that a defendant could make use of the foreign tax credit in the way that Tilga wished to use it in this case."  Tr. at 11:2-4 (Gerson).  Whether the foreign tax credit applies to effect the calculation of tax loss post-indictment, however, is a legal question.  <u>See</u> <u>United States v. Wick</u>, 34 F.App'x 273, 278 (9th Cir. 2002)(holding that the application of a carry back to reduce the total tax loss to the government is a question of law).  The United States asks the Court to do nothing more than accept the non-binding stipulation as to the calculation of tax loss. <u>See</u> Tr. at 10:23-11:6 (Gerson)("I'm certainly not asking the Court to make a legal finding that that is the law.").

"It is emphatically the province and duty of the judicial department to say what the law is." <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137, 177 (1803); <u>Prost v. Anderson</u>, 636 F.3d 578, 596 n.13 (10th Cir. 2011)("This opinion answers the question of law as it must and explains the basis for its

result.").  In line with Marbury v. Madison, the Tenth Circuit has held that "[i]t is long settled that 'a party's position in a case (even when that party is the United States) does not dictate the meaning of a federal statute.'"  Prost v. Anderson, 636 F.3d at 596 n.13 (citing United States v. Charles, 576 F.3d 1060, 1066 (10th Cir. 2009)).  Furthermore, "[i]t is one thing to allow parties to forfeit claims, defenses, or lines of argument; it would be quite another to allow parties to stipulate or bind us to application of an incorrect legal standard, contrary to the congressional purpose."  Gardner v. Galetka, 568 F.3d 862, 879 (10th Cir. 2009).  "The meaning of a statute, for example, cannot vary from case to case depending on concessions a party may have made."  Snider v. Melindez, 199 F.3d 108, 114 (2d Cir. 1999).  As the Supreme Court of the United States stated in Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281 (1917):

> The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property . . . .  No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.

243 U.S. at 290.

Even if the Court were to accept, without comment, the parties' stipulation as to tax loss, it would imply approval of United States v. Cruz, and in the next foreign tax credit case the Court would be confronted with its decision in this case.  See Tr. at 14:20-15:20 (Court, Gerson).  While the United States may vary its position from case to case, or stipulate to an interpretation contrary to its official position, the Court must try to be as consistent and principled as possible.  See Snider v. Melindez, 199 F.3d at 114.  The United States admitted that the amount of tax loss depends on an interpretation of the foreign tax credit and United States v. Cruz.  See Tr. at 11:7-11:14 (Court, Gerson).  Accordingly,  rather than simply accept the parties' stipulated tax loss calculation, the Court will decide whether federal law permits defendants to claim the foreign tax credit post-

indictment.

### B.    TILGA MAY CLAIM THE FOREIGN TAX CREDIT POST-INDICTMENT.

On their face, the statutory provisions that establish the foreign tax credit contain no limitation, other than the ten-year statute of limitation, which would prevent the foreign tax credit's application post-indictment.  See 26 U.S.C. §§ 901-909, 6511(d)(3).  Section 901(a) specifically provides that the credit "may be made or changed any time before the expiration of the period prescribed for making a claim for credit."  26 U.S.C. § 901(a) (emphasis added).  Section 905 states that, if taxes are paid to a foreign government, then they relate back to the taxable year in which they accrued.  See 26 U.S.C. § 905(c)(2)(B)(i)(II).  Section 6511(d)(3) establishes a ten-year statute of limitations for "filing the return for the year in which such taxes were actually paid or accrued."  26 U.S.C. § 6511(d)(3).

The parties, both in their sentencing memoranda and at the hearing, relied almost exclusively on United States v. Cruz, 698 F.2d at 1152.  Both parties, however, briefly mention United States v. Hoskins, a recent Tenth Circuit decision, which held that a sentencing court may take unclaimed tax deductions into account when calculating the amount of tax loss.  See 654 F.3d at 1094-95.  In United States v. Hoskins, the Tenth Circuit announced its standard for determining what deductions and credits a sentencing court may use when calculating the United States' tax loss.

United States v. Hoskins establishes that "nothing in the Guidelines prohibits a sentencing court from considering evidence of unclaimed deductions in analyzing a defendant's estimate of the tax loss suffered by the government."  654 F.3d at 1094.  Although other United States Courts of Appeals have expressed concerns about allowing defendants to avoid tax evasion prosecution, see United States v. Helmsley, 942 F.2d at 86-87 (through tax depreciation method); United States v. Cruz, 698 F.2d at 1152 (through the foreign tax credit), the Tenth Circuit expressed no such

concerns where a defendant offers "convincing proof" of entitlement to unclaimed deductions, United States v. Hoskins, 654 F.3d at 1094. The Tenth Circuit did not expressly address whether a sentencing court may consider tax credits when calculating the government's tax loss in the body of the opinion. In footnote 9, however, the Tenth Circuit suggests that the same analysis applies to the various credits that a defendant may claim. See United States v. Hoskins, 654 F.3d at 1094 n.9. Emphasizing that U.S.S.G. § 2T1.1 does not permit a defendant to benefit from deductions unrelated to the offense at issue, the Tenth Circuit stated: "Thus, unclaimed deductions for student loan interest or solar energy credits, for example, are not considered because they do not relate to the 'object of the offense.'" United States v. Hoskins, 654 F.3d at 1094 n.9 (emphasis added). That the Tenth Circuit commented on unrelated deductions and credits being prohibited suggests that related credits would be permissible.[14] Thus, under this analysis, the Court must determine whether the foreign tax credits that Tilga claims are related to the "object of the offense" -- the "loss that would have resulted had the offense been successfully completed." United States v. Hoskins, 654 F.3d at 1094 & n.9 (citing U.S.S.G. § 2T1.1).

Beyond the commentary in footnote 9, the Tenth Circuit does not elaborate on what it is required for a deduction or credit to relate to the "object of the offense." United States v. Hoskins, 654 F.3d at 1094 & n.9. Chief Judge Briscoe expressed concern "why it should matter whether the unclaimed deductions are related to the offense or not." United States v. Hoskins, 654 F.3d at 1103

---

[14]It is also reasonable to apply United States v. Hoskins to the foreign tax credit, because deductions and credits serve similar purposes -- reducing the total tax owed. A tax credit reduces the total amount of taxes that a taxpayer owes to the state or federal government, and may be in recognition of taxes already paid, as a subsidy or to encourage certain behaviors. See Tax Credit, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Tax_credit (last visited November 5, 2011). A tax deduction reduces the amount of income subject to tax for various items, especially expenses incurred to produce income. See Tax Deduction, WIKIPEDIA.ORG, http://en.wikipedia.org/wiki/Tax_deduction (last visited November 5, 2011).

(Briscoe, C.J., concurring in part and dissenting in part). She dissented with respect to the portions of the majority opinion "in which the majority takes the unnecessary step in announcing a rule permitting defendants in future cases to offer deductions they did not actually claim in order to establish a 'more accurate determination of the tax loss' under U.S.S.G. § 2T1.1(a)." United States v. Hoskins, 654 F.3d at 1100. Chief Judge Briscoe explained that, in her view, the majority opinion's rule on tax loss improperly complicates sentencing in tax cases, improperly characterizes the Tenth Circuit's holding in United States v. Spencer, and "essentially allows the defendant a 'do over.'" United States v. Hoskins, 654 F.3d at 1101-02. Additionally, her opinion noted: "I fail to see how some unclaimed deductions would be related to the offense and some deductions would not be. All the deductions relate to the return." United States v. Hoskins, 654 F.3d at 1103.

The Court finds that the foreign tax credits that Tilga claims in this case are related to the object of this offense. In United States v. Hoskins, the Tenth Circuit appears to require a direct link between the defendant's illegal actions, and the deduction or credit that they are claiming. See 654 F.3d at 1094 n.9 (majority opinion). Thus, it noted that the district court could have considered evidence of commission payments to escorts, where the defendant was charged with wilfully evading income taxes on income earned from an escort service, but not peripheral expenses unrelated to the escort service. See 654 F.3d at 1094 n.9. Tilga pled guilty to a Klein conspiracy -- a conspiracy to victimize the IRS. See Tilga PSR ¶¶ 1, 3, at 3. The object of her offense was to conceal her Canadian source of income and defraud the United States. See Tilga Plea Agreement ¶ 8(h), at 6-7. Tilga attempted to avoid paying taxes either to the United States or Canada on her Canadian income. See Tilga Plea Agreement ¶ 8(h), at 6-7. In this case, the foreign tax credit would relate to the object of the offense, because it concerns the very funds, the income from Tilga's Canadian business, that Tilga sought to conceal through her conspiracy. The foreign tax credits that

-43-

Tilga claims, for the years 1999 to 2004, are intimately connected to her Canadian funds, because all of the funds that she concealed from the United States government were also concealed from the Canadian government.  When Tilga's Canadian tax liability became fixed at $7,424,514.40 (CAD), she was entitled to a foreign tax credit on those funds, because, for the years 1999 to 2004, the statute of limitations had not yet expired and the tax liability relates back to the year in which the liability was accrued.  See 26 U.S.C. §§ 905(c)(2)(B), 6511(d)(3).  This credit is more similar to the claimed deduction for commission payments to escorts in United States v. Hoskins than claims for peripheral expenditures or solar panels, because there is a direct connection between the United States taxes Tilga sought to avoid and her Canadian tax liability for which she seeks the tax credit.  See 654 F.3d at 1094 n.9.  Following the analysis that the Tenth Circuit established in United States v. Hoskins and looking at the statutory provisions related to the foreign tax credit, the Court finds that Tilga is entitled to claim foreign tax credits for the years 1999 to 2004 and a tax loss calculation of $23,300.00 (USD), for the year in which the foreign tax credit is unavailable, is accurate.

Furthermore, allowing Tilga to claim the foreign tax credits and finding a tax loss of $23,300.00 would avoid the windfall gains about which the Tenth Circuit expressed concerns in United States v. Hoskins.  See 654 F.3d at 1095.  Although Tilga agreed to pay the United States taxes rather than the Canadian taxes, the United States would not be entitled to those funds under the foreign tax credit.  See Gov't Sentencing Memo. at 7; Tilga Plea Agreement ¶ 10(b), at 7-8.  If Tilga had filed accurate tax returns from 1999 to 2004, then the foreign tax credit would most likely eliminate any tax liability owing to the United States, because the United States and Tilga agree that Canadian taxes are higher.  See 26 U.S.C. §§ 901, 905; Gov't Sentencing Memo. at 3; Tilga's Sentencing Memo. at 9.  Thus, the application of the foreign tax credit in the calculation of tax loss is appropriate, because the United States would never have collected the remaining revenue for the

-44-

years 1999 to 2004 had Tilga not evaded her taxes.  See United States v. Hoskins, 654 F.3d at 1095
("Indeed, the government cannot claim to have lost revenue it never would have collected had the
defendant not evaded his taxes.").  Thus, the loss that would have resulted had the tax evasion been
successfully completed would have been only $23,300.00 (USD) for the year 1998, the only year
of the conspiracy for which the foreign tax credit is unavailable.  See U.S.S.G. § 2T1.1; United
States v. Hoskins, 654 F.3d at 1095.

        Although this result appears incongruent with ordinary criminal law practices -- a robber
does not eliminate his criminal liability when he returns stolen items -- the Court recognizes that the
foreign tax credit's ten-year statute of limitations and U.S.S.G. § 2T1.1 creates a unique set of
circumstances in which a defendant may reduce her liability.  In United States v. Hoskins, the Tenth
Circuit focused on U.S.S.G. § 2T1.1's plain language, which "directs courts to calculate the tax loss
that was the 'object of the offense' -- 'the loss that would have resulted had the offense been
completed.'" 654 F.3d at 1094.  The Tenth Circuit also examined the language in Note A, which
states that the default tax loss is 28% of the unreported gross income, "unless a more accurate
determination of the tax loss can be made." United States v. Hoskins, 654 F.3d at 1092.  The Tenth
Circuit held that this language does not categorically prohibit a court from considering unclaimed
deductions or credits, and that such information may be useful to ascertain the actual or intended tax
loss suffered.  See United States v. Hoskins, 654 F.3d at 1094-95.

        The Court, in determining the applicability of the foreign tax credit, follows the Tenth
Circuit's analysis as established in United States v. Hoskins rather than the Eleventh Circuit's
holding in United States v. Cruz.  The Court's holding is, however, consistent with the holding in
United States v. Cruz.  The Eleventh Circuit recognized that a defendant may claim a foreign tax
credit post-indictment.  See United States v. Cruz, 698 F.2d at 1152 ("[T]he jury instruction given

by the district court was correct.  The instruction required that there be a firmly established taxable amount owed the foreign government and determined by it before the taxpayer would be entitled to a foreign tax credit.").  The reasoning in that case, however, started from the premise that a defendant could claim a foreign tax credit at any time within the ten-year statute of limitations, without discussion, and then the Eleventh Circuit created a limitation to that principle when it held that a tax prosecution accelerates the time within which the taxpayer can exercise the right to the credit.  See United States v. Cruz, 698 F.2d at 1150-52.[15]  The Eleventh Circuit drew a line at trial, requiring defendants to claim the foreign tax credit before trial, and used concerns about tax loopholes or fraud to justify such a limitation.  See United States v. Cruz, 698 F.2d at 1152, 1152

_____

[15]At the hearing, Mr. Rubinger testified that United States v. Cruz "was highly criticized" for accelerating the expiration of the statute of limitations for claiming the foreign tax credit to the period before trial.  Tr. at 30:13-15 (Rubinger).  In researching the issue, the Court found only six cases citing United States v. Cruz, none of which engaged in a discussion of this issue, criticizing Eleventh Circuit's conclusion or otherwise.  See, e.g., United States v. Williams, 875 F.2d 846, 850, (11th Cir. 1989)(citing United States v. Cruz for the elements of a § 7201 conviction and for the principle that the Eleventh Circuit did not condone a taxpayer's "wait and see gamble").  Additionally, the Court has found only two articles that engaged in a substantive discussion about the post-indictment application of the foreign tax credit and whether the Eleventh Circuit decided United States v. Cruz correctly.  One is Mr. Rubinger's article in the Journal of Taxation.  See J. Rubinger and A. Weinstein, Foreign Tax Credits: Can a Deficiency be Retroactively Wiped Out For Criminal Tax Evasion Purposes?, 112 J. TAX'N 166, 172 (2010)("While post-indictment actions taken by a taxpayer typically have no effect on the calculation of a deficiency, certain unique aspects of the [foreign tax credits] provisions may yield a different result.").  The other, a leading legal commentator, has gone so far as to say that the Eleventh Circuit "rewrote the law of accrued foreign taxes" when it held that the United States' prosecution of a defendant for tax evasion accelerates the foreign tax credit's statute of limitations.  See 1-12 Rhoades and Langer, United States Int'l Taxation and Tax Treaties (Matthew Bender & Co.), § 12.03, n.43 ("The taxpayer claimed that his tax obligation was fixed and hence properly accruable even though not assessed in his home country.  Had the taxpayer not been accused of garnering his wealth from drug peddling his argument may have fallen on more receptive ears.  The majority was so convinced, however, that he was going to escape punishment of any sort . . . that it rewrote the law of accrued foreign taxes.").  The Court need not, and does not, decide whether the foreign tax credit's statute of limitations should be accelerated before trial -- the aspect of the United States v. Cruz decision which these articles criticize.

n.2.  The Eleventh Circuit also justified accelerating the foreign tax credit's statute of limitations, because there is a six-year statute of limitations on prosecution under § 7201.  See United States v. Cruz, 698 F.2d at 1152; 26 U.S.C. § 6531 (establishing general six-year statute of limitations for tax evasion).  "[I]f the United States waits for the ten years allowed by statute for the taxpayer to fix the amount of foreign tax liability, then the six-year statute of limitations on the section 7201 prosecution lapses."  United States v. Cruz, 698 F.2d at 1152.  The Court agrees that there is a tension between the two limitations periods and that the foreign tax credit's ten-year statute of limitations allows tax evaders to fix their criminal liability post-indictment, in a way that is unique in the criminal system.  The Tenth Circuit has held, however, that the §7201 "statute of limitations begins to run on the date of the last affirmative act of evasion."  United States v. Anderson, 319 F.3d 1218, 1219 (10th Cir. 2003).  This rule may alleviate some of the Eleventh Circuit's concerns in United States v. Cruz, because the United States will still be able to prosecute lengthy tax evasion schemes and ensures that, in at least some cases, the difference between the § 7201 statute of limitations and the foreign tax credit statute of limitations will be less than four years.  Tilga's case offers a good example, because her tax evasion scheme began in 1998, the last alleged affirmative act of tax evasion was in 2004, and the grand jury indicted her in 2009.  See Tilga Plea Agreement ¶ 10(a)-(b).  In 2009, the foreign tax credit's statute of limitations for the first year of the conspiracy, 1998, had expired.  Thus, difference in length of the statutes of limitations for prosecution and for the foreign tax credit will not always bar prosecution for the evasive conduct.  Additionally, not every foreign tax liability will be sufficient to eliminate a taxpayer's liability to the United States.  See 26 U.S.C. § 901; Gov't Sentencing Memo. at 3 (stating that, because Canadian taxes are higher than taxes in the United States, the foreign tax credit eliminates tax liability to the United States for the years 1999-2004).

-47-

The Eleventh Circuit opinion offers no principled rationale for drawing the line at trial, rather than at sentencing or some other point in the litigation post-indictment.  See United States v. Cruz, 698 F.2d at 1152.  The Tenth Circuit in United States v. Hoskins did not discuss whether a defendant must claim a deduction or credit before any point in the tax prosecution.  See 654 F.3d at 1092-97.  Moreover, it is not a proper task for the Court to rewrite the foreign tax credit's statute of limitations to address the inherent tension between that time frame and § 7201's statute of limitations.  See 1-12 Rhoades and Langer, United States Int'l Taxation and Tax Treaties (Matthew Bender & Co.), § 12.03, n.43 (criticizing the Eleventh Circuit for accelerating the foreign tax credit's statute of limitations period in United States v. Cruz).  Although the Internal Revenue Code may not provide all of the safeguards desirable to protect the public interest, the Court is not the body best situated to address this issue -- that is a problem for Congress.  See United Student Aid Funds, Inc. v. Espinosa, 130 S.Ct. 1367, 1382 (2010)("And to the extent existing sanctions prove inadequate to this task, Congress may enact additional provisions to address the difficulties the United States predicts will follow our decision."); Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 374 (1986)("If the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not the Board or the courts, to address.").  Even if the Court were to adopt the Eleventh Circuit's requirement that a foreign tax credit be fixed before trial and attempt to address the criticisms of that opinion, the Court need not decide whether those limitations apply here because Tilga satisfied the Eleventh Circuit test when she fixed her foreign tax liability before trial.  See Gov't Sentencing Memo. at 14.

Although asking the Court to accept the stipulated tax loss amount, the United States refers the Court to the Department of Justice's position that a "taxpayer cannot defeat a prosecution by

amending her returns post-Indictment" and refers the Court to several cases.  Gov't Sentencing Memo. at 11 (citing United States v. Helmsley, 941 F.2d 71 (2d Cir. 1991); United States v. Kleifgen, 557 F.2d 1293 (9th Cir. 1977); Witte v. Commissioner, 513 F.2d 391 (D.C. Cir. 1975); Fowler v. United States, 352 F.2d 100 (8th Cir. 1965)).  The United States Court of Appeals for the Second Circuit in United States v. Helmsley agreed with the United States Court of Appeals for the Eighth Circuit's decision in Fowler v. United States and held that a taxpayer who has used a particular depreciation method may not defend against an evasion charge on the ground that, under an alternative method, the taxpayer could have claimed additional depreciation.  See United States v. Helmsley, 941 F.2d at 86.  The United States asserts that its position mirrors the general rule established in the Second Circuit's United States v. Helmsley decision -- that a taxpayer may not amend her returns or suggest an alternative means of calculating the taxes owed.  The Second Circuit expressed concerns about tax evaders using the tax system to avoid paying the full amount due after authorities discover their scheme, if the Second Circuit did not find post-indictment alterations impermissible.  See United States v. Helmsley, 941 F.2d at 86-87.  It stated

> The law could hardly be otherwise.  If it were, evaders with complicated returns would be allowed to evade taxes on one portion of their return while using a depreciation period that would be the most profitable in the long run if the evasion went undetected.  If the evasion were uncovered, then they would need only to recalculate under a shorter depreciation period that would increase deductions for the years in which evasion is charged.

United States v. Helmsley, 941 F.2d at 86-87.  The United States cites cases from other circuits for the same proposition.  See United States v. Kleifgen, 557 F.2d at 1298 n.9 ("The Commissioner's consent to a change in accounting methods is required regardless of whether the change is from one proper method to another proper method or from an improper method to a proper one."); Witte v. Commissioner, 513 F.2d at 393-94 (same).  None of the cases cited in favor of the Department of

Justice's position are from the Tenth Circuit.

While the decisions the United States cites raise important issues about the ability of defendants to avoid tax evasion charges post-indictment, the Tenth Circuit's United States v. Hoskins opinion does not appear to share such concerns.  Rather, the Tenth Circuit's concerns focus on whether the government will reap a windfall as a result of tax evasion.  See United States v. Hoskins, 654 F.3d at 1095.  The Tenth Circuit's decision in United States v. Hoskins also does not reference the United States v. Helmsley line of cases.  The divergence between the two opinions can perhaps be explained by the evolution of U.S.S.G. § 2T1.1's language.  Earlier versions of § 2T1.1 "required courts to calculate tax loss based on gross income and prohibited consideration of legitimate but unclaimed deductions."  United States v. Hoskins, 654 F.3d at 1096 (emphasis original).  The 1991 version, for example, made "irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim."  U.S.S.G. § 2T1.1 cmt. n.4 (1991).  Later versions of the guidelines eliminated such language and instructs courts that tax loss "shall be treated as equal to 28% of the unreported income . . . , unless a more accurate determination of the tax loss can be made."  U.S.S.G. § 2T1.1 Note A (emphasis added).  The Second Circuit  also recognized that later versions of the guidelines "permit[] consideration of legitimate but unclaimed deductions."  United States v. Martinez-Rios, 143 F.3d 662, 671 (2d Cir. 1998).  In the United States v. Martinez-Rios opinion, the Second Circuit does not refer to the United States v. Helmsley opinion.  See United States v. Martinez-Rios, 143 F.3d 662.  This later decision undercuts the United States' reliance on United States v. Helmsley and provides further support for the Court's decision that defendants may claim the foreign tax credit post-indictment.  Thus, the Court applies the reasoning from United States v. Hoskins to Tilga and Chandler's foreign tax credit claim, and determines that, under the law of the Tenth Circuit, Tilga and Chandler may claim the foreign tax

credit for all years within the statute of limitations.

The Court finds that the foreign tax credit may be claimed post-indictment and that Tilga has successfully established her Canadian tax liability, such that she could eliminate any tax liability owed to the United States for the years 1999 to 2004.  Accordingly, the Court will sustain the objection to the calculation of tax loss based on any figure other than the $23,300.00 (USD) figure established in the Plea Agreements and accept the stipulations in the Plea Agreements.  See Tilga Plea Agreement ¶ 10(b), at 8; Chandler Plea Agreement ¶ 9(a), at 5.  The amount of loss for both Tilga and Chandler is thus $23,300.00 (USD).

## II.      THE COURT WILL OVERRULE THE OBJECTION TO THE PSR'S REFERENCES TO SOPHISTICATED MEANS.

The PSRs indicate that "the defendant and co-defendant utilized Pure Trust Organizations as business entities, wiring money to offshore accounts, and back to shell companies in an effort to hide the true amount of money earned."  Tilga PSR ¶ 38, at 18-19; Chandler PSR ¶ 36, at 15.  Based on this conduct, the PSRs maintain that a 2-level sophisticated-means enhancement should apply. See Tilga PSR ¶ 38, at 19; Chandler PSR ¶ 36, at 15.  In the Plea Agreements, the parties stipulated that neither defendant used sophisticated-means to commit the offense.  See Tilga Plea Agreement ¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.  Tilga argues that her conduct did not involve especial complexity or intricacy, see Tilga's Sentencing Memo. at 11, and that the enhancement requires that the alleged sophisticated means be "something beyond what happens in the garden variety type of offense," Tr. at 42:13-25 (Theus).  Tilga maintains that "tax offenses involving foreign or offshore bank accounts, and conspiracies for the tax offenses involving foreign or offshore bank accounts, inherently involve sophistication."  Tilga's Sentencing Memo. at 11.  Tilga further asserts that, to the extent that sophisticated means were involved in her case, they were not

of her creation.  See Tilga's Sentencing Memo. at 11.  At the hearing, the United States and Chandler argued that Chandler and Tilga's offenses did not use sophisticated means, because Tilga and Chandler only purchased the PTOs -- they did not create them.  See Tr. at 40:5-11 (Court, Gerson); Tr. at 45:16-19 (Johnson).  All parties agree that CTC used sophisticated means when it created the PTOs.  See Tr. at 43:13-20 (Theus); Tr. at 39:3-5 (Gerson); Tr. at 45:19-23 (Johnson).  Chandler also argued in a supplementary letter that, under Blakely v. Washington and United States v. Booker, "any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  Letter at 2 (citations omitted).

U.S.S.G. § 2T1.1 provides for a 2-level base offense enhancement where the offense involved sophisticated means.  See U.S.S.G. § 2T1.1(b)(2) ("If the offense involved sophisticated means, increase by 2 levels.").  Application Note 4 provides: "For the purposes of subsection (b)(2), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. § 2T1.1 cmt. n.4 (emphasis added).

Chandler and Tilga must admit the facts providing the basis for the sophisticated-means enhancement or the United States must prove them by a preponderance of the evidence.  See United States v. Magallanez, 408 F.3d at 685;  United States v. Hall, 473 F.3d 1312.  Chandler suggests that the standard should be beyond a reasonable doubt; however, the Tenth Circuit has held that "Booker makes clear that judicial fact-finding by a preponderance of the evidence standard is unconstitutional only when it operates to increase a defendant's sentence mandatorily."  United States v. Hall, 473

F.3d at 1312.  The Court believes that it can apply the sophisticated-means enhancement under

U.S.S.G. § 2T1.1 using only those facts that Tilga and Chandler admitted in the Plea Agreements.

Nonetheless, the Court notes that Tilga and Chandler both agreed that "the Court may rely on any

of the[] facts [included in the Plea Agreement], as well as the facts in the presentence report, to

determine [their]  sentence[s], including, but not limited to, the advisory guideline offense level."

Chandler Plea Agreement ¶ 8, at 4.  <u>Accord</u> Tilga Plea Agreement ¶ 9, at 7.

Tilga originally argued that "tax offenses involving foreign or offshore bank accounts, and

conspiracies for the tax offenses involving foreign or offshore bank accounts, inherently involve

sophistication," and that Tilga's conduct must be analyzed in context of her class of offense.  Tilga's

Sentencing Memo. at 11.  The United States did not address this aspect of Tilga's argument.  <u>See</u> Tr.

at 39:3-41:6 (Court, Gerson).  At the hearing, however, Tilga agreed that CTC's conduct would

qualify as sophisticated means.  <u>See</u> Tr. at 43:13-20 (Theus)("No I think Commonwealth Trust

Company, in its creation of a number of types of [products], marketing those products, managing

those products for their customers . . .does engage in sophisticated means.").  Thus, Tilga appears

to have conceded at the hearing that the use of offshore bank accounts and sham entities constitutes

sophisticated means despite her argument to the contrary in her sentencing memorandum.  The

application note specifically instructs sentencing courts that "fictitious entities, corporate shells, or

offshore financial accounts ordinarily indicate[] sophisticated means."  U.S.S.G. § 2T1.1 cmt. n.4.

If the Court followed Tilga's original argument, this portion of Application Note would be devoid

of meaning, because Tilga would require the United States to establish that a defendant's conduct

was unique for the category of offense.  <u>See</u> Tilga's Sentencing Memo. at 11.  Thus, for defendants

using fictitious entities, corporate shells, or offshore accounts to qualify for the sophisticated-means

enhancement, Tilga would require that such means be used in an especially complex or novel

manner, and ignore the inherent complexity of those entities, which is what the Application Note recognizes.  See United States v. Ambort, 405 F.3d at 1120 (stating that the sophisticated-means enhancement applies to actions that are "more complex or demonstrate[] greater intricacy or planning than a routine tax-evasion case"); United States v. Schwartz, 408 F.App'x at 870 (affirming the sophisticated-means enhancement where the defendant created and used fictitious trusts to hide assets from the IRS, even though the defendant was not a sophisticated businessman); United States v. Minneman, 143 F.3d at 1283 (holding that, the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income).

Furthermore, the Tenth Circuit defines "garden variety" tax fraud through reference to United States v. Rice, "a case of claiming to have paid withholding taxes not paid," and United States v. Stokes, a case of "not disclosing income to one's accountant."  United States v. Wardell, 218 F.App'x 695, 698 (10th Cir. 2007)(citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d at 281-83).  The standard does not look to the specific category of tax evasion that the defendant committed to determine whether the sophisticated means enhancement applies; rather the Tenth Circuit instructs courts to determine whether the tax scheme was "more complex or demonstrates greater intricacy or planning than a routine tax evasion case."  United States v. Ambort, 405 F.3d at 1113.  Other courts have rejected similar arguments.  See United States v. O'Doherty, 643 F.3d 209, 220 (7th Cir. 2011)("Although [the defendant] protests that corporations are ubiquitous 'in most modern business transactions' . . . their use to impede the discovery of personal income, as they were used here, permits the imposition of the enhancement."); United States v. Maggert, 428 F.App'x 874, 880 (11th Cir. 2011)("To facilitate his tax evasion scheme, Maggert set up two fictitious entities and used them to try and hide his income.  Such conduct falls squarely within § 2T1.1's definition of sophisticated means.").

Tilga, Chandler, and the United States all argue that Tilga's conduct does not qualify for the sophisticated-means enhancement, because she did nothing more than purchase a product and, to the extent that sophisticated means were used, they were not of her creation. See Tilga's Sentencing Memo. at 11; Tr. at 40:5-11 (Court, Gerson); Tr. at 45:16-19 (Johnson). The PSRs state that Tilga and Chandler's conduct warrants a 2-level sophisticated means enhancement, because "[i]n this case, the defendant and co-defendant utilized Pure Trust Organizations as business entities, wiring money to offshore accounts, and back to shell companies in an effort to hide the true amount of money earned." Tilga PSR ¶ 38, at 18-19; Chandler PSR ¶ 36, at 15. Neither the United States nor Tilga, either in a sentencing memorandum or at the hearing, directed the Court to any federal court opinion that drew a distinction between a customer who purchases sophisticated means from a corporation and the producers of the sophisticated product. See Tr. at 41:1-4 (Court, Gerson); Tr. at 43:23-44:6 (Court, Theus). The Court, however, located three cases that discuss similar factual situations and U.S.S.G. § 2T1.1(b)(2). The United States Court of Appeals for the First Circuit, in United States v. Anthony, 545 F.3d 60 (1st Cir. 2008) -- addressed the same facts as the Court, a customer who purchased trusts and corporations from CTC -- and held that there was no error in applying the sophisticated-means enhancement. See 545 F.3d at 63, 68. In United States v. Firestien, No. 04-331, 2007 WL 174108 (W.D.N.Y. Jan. 19, 2007), the United States District Court for the Western District of New York applied the sophisticated-means enhancement where the defendant established shell corporations under Nevada law and used bank accounts in Costa Rica. See 2007 WL 174108, at *2. The Western District of New York found the enhancement appropriate, notwithstanding the defendant's argument that the Anderson Ark program informed him of the steps to take, because he took affirmative action to set up the shell corporation and utilize the Costa Rican accounts. See United States v. Firestien, 2007 WL 174108, at *2. In United States v. Baxter, No. 04-371-1,

2006 WL 1155872 (N.D. Ill. Apr. 27, 2006), the United States District Court for the Northern District of Illinois held that a 2-level sophisticated-means enhancement was inappropriate. See 2006 WL 1155872, at *4.  In that case, the defendant used that "Aegis system" and "believed in the legality of the advice given by the Aegis instructors and in the legitimacy of the Aegis system." United States v. Baxter, 2006 WL 1155872, at *3.  The Northern District of Illinois found that, because the defendant "did not admit[] to participating in the Aegis system knowing that it was illegal," her conduct was "certainly . . . not as sophisticated as 'using offshore bank accounts, or transactions through corporate shells."  United States v. Baxter, 2006 WL 1155872, at *4.

Tilga and Chandler's conduct fits squarely within what Application Note 4 contemplates as sophisticated means.  The application note states that ordinarily the "use of fictitious entities, corporate shells, or offshore financial accounts" indicate sophisticated means.  U.S.S.G. § 2T1.1 cmt. n.4 (emphasis added).  There is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement.  Taxpayers should not be able to avoid a sophisticated-means enhancement because they pay someone else to think of the scheme or means that they then use to defraud the United States.  The application note focuses on whether such means were "used," and this limited factual inquiry is the appropriate one.  See U.S.S.G. § 2T1.1 cmt. n.4.  Tilga and Chandler used "corporate shells" and "offshore accounts." Tilga wired nearly $8.7 million (USD) into the United States from offshore accounts, she transferred funds between nominee entities, and she used the nominee entities to purchase real estate and vehicles.  See Tilga PSR ¶¶ 18-19, at 10.  In her Plea Agreement, Tilga admits that: (i) she purchased several nominee entities from CTC; (ii) she directed her Canadian businesses to distribute her share of the revenue to one such entity; (iii) the entity then transferred funds to other nominee entities at her direction; (iv) she used those entities to purchase real property, renovate those

properties, and purchase vehicles; and (v) she did all this with the intent to conceal her Canadian income source and defraud the United States.  See Tilga Plea Agreement ¶ 8(d)-(h), at 4-7.  Chandler assisted Tilga in using the offshore trusts to move money, he rented mailboxes in the names of entities that he and Tilga purchased from CTC, and titled an automobile in the name of one of the CTC purchased entities.  See Chandler Plea Agreement ¶ 7(a)-(e).  At the hearing, Tilga asserted that, to qualify for the sophisticated-means enhancement, there must be "some deliberate or volitional activity on the part of the accused in terms of creation or management of these types of products."  Tr. at 45:1-6 (Theus) (emphasis added).  Tilga and Chandler were more than a passive participants in this scheme.  Rather, their conduct indicates that they took affirmative actions to manage the PTOs, shell corporations, and accounts to keep the United States from taxing Tilga's Canadian income.  See United States v. Firestein, 2007 WL 174108, at *2.  Furthermore, Tigla and Chandler's actions went beyond those of the defendant in United States v. Baxter, because Tilga and Chandler used offshore bank accounts and shell corporations and because Tilga and Chandler admitted that they "entered into an agreement with certain employees of CTC . . . with the intent to conceal her Canadian source of income and the intent to defraud the United States."  Tilga Plea Agreement ¶ 8(h), at 6-7.  See also Chandler Plea Agreement ¶ 7(b)-(c), at 4; United States v. Baxter, 2006 WL 1155872, at *4.  The First Circuit's holding in United States v. Anthony, applying the sophisticated-means enhancement to another CTC customer, also bolsters the Court's conclusion here.  See United States v. Anthony, 545 F.3d at 63, 68.

Chandler, in his letter in support of the parties' stipulations, argued that United States v. Lewis and United States v. Rice require that the Court not apply the sophisticated-means enhancement.  See Letter at 2.  In United States v. Rice, the defendant -- Rice -- established several S Corporations, which do not have to pay taxes, but must file quarterly statements concerning their

employees' withholding.  See 52 F.3d at 844-45.  Over the course of three years, Rice claimed more

money on his individual tax return than had been withheld.  See United States v. Rice, 52 F.3d at

845.  The Tenth Circuit held that Rice's fraud was "the functional equivalent of claiming more in

itemized deductions than actually paid" and reversed the application of the sophisticated-means

enhancement, because "[i]f that scheme is sophisticated within the meaning of the guidelines, then

every fraudulent tax return will fall within that enhancement's rubric."  United States v. Rice, 52

F.3d at 849.  Chandler suggests that his conduct was similar to Rice's, because Tilga and Chandler

"merely requested, of others, the movement of moneys from one account to a different account."

Letter at 2.  Tilga and Chandler's conduct, however, goes beyond claiming more in deductions than

actually paid, or claiming more withholdings than actually withheld.  Tilga and Chandler certainly

"requested, of others, the movement of moneys," Letter at 2; they requested that funds for Tilga's

Canadian businesses be transferred to one nominal entity, then transferred them to other nominal

entities, then used the funds to purchase real estate and vehicles that would not be titled in their

names, all to ensure that the IRS never discovered their Canadian income, see Chandler Plea

Agreement ¶ 7(a)-(e), at 3-4; Tilga Plea Agreement ¶ 8(d)-(h), at 4-7.  Tilga and Chandler actively

attempted to conceal their entire Canadian income; they did not merely falsely report an amount on

their tax form.  Furthermore, in United States v. Lewis, another case Chandler cites, the Second

Circuit stated that "the provision targets conduct that is more complex, demonstrates greater

intricacy, or demonstrates greater planning than a routine tax-evasion case."  93 F.3d at 1080.  See

also Letter at 1-2.  Here, even discounting the creation of the PTOs and offshore accounts, Tilga and

Chandler admit to taking affirmative steps to transfer money between accounts to conceal their

income, to using the offshore trusts for these purposes, to titling their property in the name of

nominal entities to avoid detection, and to taking other steps, i.e. setting up mailboxes, to conceal

the true amount of their income.  <u>See</u> Tilga Plea Agreement ¶ 8(d)-(h), at 4-7;  Chandler Plea

Agreement ¶ 7(a)-(e).  Under almost any metric, their use of these items was complex, so complex

that Tilga and Chandler attended seminars to learn more.  <u>See</u> Tr. at 45:24-25 (Johnson)("[Y]ou

have Tilga who is a customer.  She went to one of their seminars . . .."); Tr. at 49:9-11

(Johnson)("[T]hat would be paragraph 40 that the probation officer indicates that Mr. Chandler

attended some of the seminars.  That is true . . .").  Tilga and Chandler's purchases from CTC,

purchases of real estate, and attendance at seminars also indicate that a great deal of planning went

into how best to conceal their income.  Thus, even under the two cases Chandler cites, Tilga and

Chandler both qualify for the sophisticated-enhancement.

Tilga and Chandler's offense was far "more complex or demonstrates greater intricacy or

planning than a routine tax-evasion case," <u>see</u> <u>United States v. Ambort</u>, 405 F.3d at 1120, and fits

well within the range of conduct that the sophisticated-means enhancement targets, <u>see</u> U.S.S.G. §

2T1.1 cmt. n.4.  Consequently, the Court will overrule the objection to the PSR's reference to the

sophisticated-means enhancement, and will apply the 2-level enhancement to Tilga and Chandler's

base offense levels.  The Court will also not accept the parties' stipulations in the Plea Agreements

that neither defendant was subject to a sophisticated-means enhancement.  <u>See</u> Tilga Plea Agreement

¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.

**III.    THE COURT WILL SUSTAIN THE OBJECTION TO THE PSR'S REFERENCES
         TO SPECIAL SKILLS.**

Tilga's PSR states that "the defendant attended seminars sponsored by Commonwealth Trust

Company and utilized their program to start Pure Trust Organizations . . . . The knowledge of how

to start a PTO and the purpose of a PTO is not a skill commonly possessed by the public."  Tilga

PSR ¶ 42, at 20.  The PSR also references Tilga's Masters of Business Administration degree before

-59-

concluding that, "[b]ased on this information, a two-level increase should be applied." Tilga PSR ¶ 42, at 20. The PSR on Chandler states that "the defendant attended CTC seminars, became closer than some with founders and managers of the company, and was able to assist his wife and setting up offshore accounts and wiring money to and from the accounts." Chandler PSR ¶ 40, at 16-17. The PSRs maintain that, based on this information, Tilga and Chandler should receive a 2-level special skills enhancement. See Tilga PSR ¶ 42, at 20; Chandler PSR ¶ 40, at 16-17. In the Plea Agreements, the parties stipulated that no special skills enhancement should apply either to Tilga or to Chandler. See Tilga Plea Agreement ¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5. The United States asserted that neither Tilga nor Chandler "possessed any special skill with respect to taxes." Tr. at 50:1-4 (Gerson). The United States recognized that Tilga is highly educated, but argued that Tilga did not "victimize[] some other person by making use of these special skills." Tr. at 50:5-15 (Court, Gerson).

U.S.S.G. § 3B1.3 provides that "[i]f the defendant abused a position of public or private trust, or used a special skill in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." U.S.S.G. § 3B1.3. Application Note 4 defines "special skill" as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt. n.4. To apply a § 3B1.3 enhancement: (i) the defendant must possess a special skill or a position of trust; and (ii) the defendant must use that skill or abuse that position to significantly facilitate the commission or concealment of the offense. See United States v. Burt, 134 F.3d at 998-99.

The PSR seems to suggest that Tilga possessed two sets of special skills that she brought to bear in the commission of her offense: (i) business skills acquired in the course of her education; and (ii) skills related to PTOs acquired during CTC's seminars. See Tilga PSR ¶ 42, at 20. The Court

will consider each "special skill" in turn.

Tilga has a bachelor's degree in Hotel Administration from Cornell University and a Masters in Business Administration from the Wharton School of Business. See Tilga PSR ¶¶ 68-69, at 26. The skills she acquired over the course of her education, however, were not tax specific, and related to marketing and collecting fees for services provided. See Tr. at 51:2-6 (Gerson). There is no evidence that Tilga used the business and marketing skills that she acquired during her education to significantly facilitate the concealment of her crime. See United States v. Burt, 134 F.3d at 1000 ("Without the requisite connection between the crime and Defendant's special knowledge, the section 3B1.3 enhancement for use of a special skill cannot be affirmed."). While Tilga has some special education, the Court is not convinced that the special skills that she acquired during that education facilitated the commission of the concealment of the offense.

Tilga attended several CTC seminars and used CTC's program to start PTOs. See Tilga PSR ¶ 42, at 20. Chandler also attended some CTC seminars, but argued that "attending some seminars would not rise to the level of a special skill." Tr. at 49:7-14, 51:14-25 (Johnson). Generally, attending a few seminars would not appear to be comparable to a skill requiring "substantial education, training or licensing." U.S.S.G. § 3B1.3 cmt. 4 (emphasis added). The Tenth Circuit recognizes, however, that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill." United States v. Hinshaw, 1999 WL 9762, at * 3. At the hearing, Chandler stated that "CTC held Tilga's hand throughout the time period" and was involved in the administration of Tilga's trusts. Tr. at 46:1-6 (Johnson). Tilga also asserts that she accepted the representations of CTC's sales personnel, lawyers, and accountants, and did no more than purchase CTC products. See Tilga's Sentencing Memo. at 7. CTC conducted seminars on a variety of topics, including the "use of trustee documents, privacy issues, offshore banking,

certificate holder issues, how to wire transactions to offshore accounts and where to store documents." Tilga PSR ¶ 15, at 9. While these seminar topics conveyed specialized knowledge, there is no evidence that participants were taught specialized skills not possessed by members of the general public, as § 3B1.3 requires. See U.S.S.G. § 3B1.3 cmt. 4. More likely is that participants walked away from these seminars with a general understanding of the topic, which may be more than what the public knows, but which still does not rise to the level of a specialized skill. Although Tilga and Chandler used sophisticated programs, offshore accounts, and other entities, as discussed above in reference to the sophisticated-means enhancement, there is no evidence that Tilga or Chandler possessed any special skills related to the creation or operation of the PTOs. Furthermore, even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime, because CTC exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program. See Tilga PSR ¶¶ 18-20, at 10-11; United States v. Lee, 296 F.3d 792, 794-95, 799 (9th Cir. 2002)(holding that, a defendant did not possess a "special skill" where the defendant copied and pasted "scripts from a legitimate website to create a phony website").

Accordingly, the Court finds that neither Tilga nor Chandler used a special skill to conceal their offense and will accept the parties' stipulations to that effect in the Plea Agreements. See Tilga Plea Agreement ¶ 10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.

## IV.   THE COURT WILL SUSTAIN THE OBJECTION TO THE PSR'S REFERENCES TO AN AGGRAVATING ROLE ADJUSTMENT.

The PSR states that Tilga can be identified as an organizer, leader, manager, or supervisor in the criminal activity, thus warranting a 2-level enhancement. See Tilga PSR ¶ 41, at 20. The PSR asserts that Tilga had her husband, as well as her bookkeeper, open mail accounts for shell

companies, so that they would not be associated with her name, and that she used unindicted co-conspirators to assist in her attempt to evade paying taxes to the IRS. <u>See</u> Tilga PSR ¶ 41, at 20. In the Plea Agreement, the parties stipulated that Tilga's offense did not involve an aggravating role. <u>See</u> Tilga Plea Agreement ¶ 10(c), at 8. At the hearing, the United States and Tilga asserted that she was not an organizer, leader, or supervisor of the criminal activity, because the criminal activity extended to CTC, and the CTC executives were the ones who created the product. <u>See</u> Tr. at 48:12-21 (Court, Gerson, Theus).

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's offense level based on a defendant having played an aggravating role in the offense. Under § 3B1.1(a), "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S.S.G. § 3B1.1(a). Lesser enhancements are specified for defendants who are "managers or supervisors" rather than organizers or leaders, and for defendants involved in smaller-scale criminal conduct. U.S.S.G. § 3B1.1(b)-(c). Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1 cmt. n.4. The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'" <u>United States v.</u>

Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008) (quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).

The criminal activity in this case extends beyond Tilga to CTC's executives and employees, who encouraged and created the means for this offense.  See Tilga PSR ¶¶ 10-15, at 7-9. Considering the entire criminal organization, Tilga is substantially less culpable than those at CTC. The PSR maintains that Tilga directed the activities of her husband and bookkeeper.  Tilga's role, however, is much less culpable than the conduct in other cases where the Tenth Circuit has approved the aggravating role enhancement.  See United States v. Cruz Camacho, 137 F.3d 1220, 1225 (10th Cir. 1998)(affirming an aggravating role enhancement where the defendant had a leadership role, recruited other members, directed activities, and paid other members of the organization); United States v. Bernaugh, 969 F.2d 858, 863 (10th Cir. 1992)(affirming an aggravating role enhancement where the defendant was the moneyman, engaged in negotiations, and took possession of drugs). The nature of Tilga's role was not such that she exercised decision-making authority or control over the criminal enterprise, and the nature of her participation was no more than that of an average participant in the tax evasion scheme that CTC established.  Indeed, as a consumer of CTC's products, Tilga appears to be the average participant.

Accordingly, the Court agrees with the parties that an aggravating role enhancement is inappropriate and will sustain the objection to the PSR's references to the applicability of such an enhancement.  The Court will also accept the stipulation to that effect in the Plea Agreement.  See Tilga Plea Agreement ¶ 10(c), at 8.

## V.   THE COURT WILL OVERRULE THE OBJECTION TO THE PSR'S REFERENCES TO OBSTRUCTION.

The PSR asserts that, but for the Plea Agreement, a obstruction enhancement, pursuant to

U.S.S.G. § 3C1.1, would be appropriate, because during the three years that Tilga employed Simmons she told him that if he were ever asked about Tilga's property, to lie, and because, upon learning of the IRS' investigation, Tilga told Simmons that he was going to pay.  See Tilga PSR ¶ 43, at 20-21.  The Plea Agreement stipulates that Tilga's offense did not involve obstruction of justice.  See Tilga Plea Agreement ¶ 10(c), at 8.  At the hearing, the United States asserted that it could prove that Tilga said the things the PSR alleges, through the testimony of Simmons, but stated that it believed that the statements showed Tilga's state of guilty conscious, rather than a motive to obstruct.  See Tr. at 53:22-54:8 (Gerson).  Tilga responded that she could impeach Simmons, and that there is no admissible evidence that Tilga intended to obstruct or impede the administration of justice.  See Tr. at 53:10-20 (Theus).  The United States conceded that it would not be able to prove obstruction of justice by a preponderance of the evidence.  See Tr. at 54:22-55:14 (Court, Gerson).

U.S.S.G. § 3C1.1 states:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

The application notes state: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 cmt. n.1.

Tilga's alleged conduct, asking a witness to lie, generally falls within the ambit of conduct considered obstructive in § 3C1.1.  See United States v. Farnsworth, 92 F.3d at 1011; United States v. Hernandez, 967 F.2d 456, 459 (10th Cir. 1992)(finding that the defendant asked another to lie as to his culpability, thereby impeding administration of justice).  Tilga's PSR indicates that most of

her conduct occurred before the start of the investigation.  See Tilga PSR ¶ 43, 20-21.  The conduct, therefore, must be "purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  U.S.S.G. § 3C1.1 cmt. n.1. The United States conceded, at the hearing, that it would not be able to establish by a preponderance of the evidence that Tilga's conduct was "reasonably likely to interfere with the investigation."  Tr. at 55:3-5 (Gerson).  The Court agrees that it is unlikely that the false statements of an employee that Tilga did not own property would reasonably interfere with the investigation or thwart prosecution.  Any reasonable investigation would question both whether an employee would have personal knowledge of the employer's property ownership and the accuracy of such knowledge.  Additionally, the United States conceded that Tilga's statements upon learning of the investigation were an "unpremeditated emotional response on Ms. Tilga's part that showed her state of mind with respect to her knowledge that she was committing tax evasion but not that it was being uttered for the purpose of trying to prevent the United States from carrying out an investigation in this case."  Tr. at 53:4-8 (Gerson). The Court finds that Tilga's alleged statements, that she "was not going to take the fall" and that Simmons was "going to pay," Tilga PSR ¶ 43, at 21, are not the kind of statements aimed at obstructing justice.  Tilga's alleged statements do not threaten Simmons or otherwise indicate that he should do anything to impede the investigation, which the Court would recognize as obstruction. See United States v. Yuselew, 2010 WL 3834418, at *12-13 (finding the obstruction enhancement applicable where the defendant threatened the only witness with death and attempted to bury evidence).

Because the United States concedes that it could not prove obstruction of justice by a preponderance of the evidence, and because the Court finds that Tilga's alleged statements were not reasonably likely to thwart the investigation or prosecution, the Court concludes that this conduct

cannot form the basis of an obstruction-of-justice enhancement. Furthermore, because the United States concedes, and the Court agrees, that Tilga's later statement was not purposefully directed at obstructing justice, the Court concludes that there is no basis for an obstruction-of-justice enhancement pursuant to § 3C1.1. Accordingly, the Court will sustain the objection and accept the stipulation in the Plea Agreement. See Tilga Plea Agreement ¶ 10(c), at 8.

## VI.   THE COURT OVERRULES THE OBJECTIONS TO THE TILGA PSR'S FAILURE TO ACKNOWLEDGE THE PLEA AGREEMENT'S ADVANTAGE TO THE UNITED STATES AND TO RECOGNIZE THE ADVISORY NATURE OF THE GUIDELINES.

Tilga objected to her PSR's failure to explicitly recognize that the guidelines are advisory and the PSR's failure to acknowledge the advantages that the United States gained from the Plea Agreement. See Tilga's Sentencing Memo. at 4. At the hearing, however, Tilga stated that her objection, to her PSR's failure to acknowledge the advantages that the United States received from the Plea Agreement, had been addressed, because the USPO agreed to reflect that Tilga brought those matters to the Court's attention, and was more appropriate for argument rather than inclusion in the PSR. See Tr. at 57:21-58:3 (Theus). Tilga also admitted that her objection is moot to the extent that the information is presently before the Court through her sentencing memorandum. See Tr. at 58:4-7 (Court, Theus). Additionally, Tilga stated that her objection to her PSR's failure to acknowledge the advisory status of the guidelines had been satisfactorily addressed and included in the sentencing memorandum. See Tr. at 58:12-59:2 (Court, Theus).

Because the USPO satisfactorily addressed these objections, by reflecting that Tilga brought the matter to the Court's attention, and because Tilga concedes that they are not moot, the Court will overrule the objections to her PSR's failure to state that the guidelines are advisory and to her PSR's failure to acknowledge the advantages that the United States' obtained from the Plea Agreement.

**IT IS ORDERED** that the objections in Defendant Carolynne Tilga's Memorandum in Aid of Sentencing of Defendant Carolyne Tilga and Limited Objection to Presentence Report, filed October 6, 2011 (Doc. 161), are sustained in part and overruled in part.  The Court accepts the parties' stipulated tax loss calculation, $23,300.00 (USD), and sustains the objection to the Defendant Carolynne Tilga's Presentence Investigation Report ("Tilga's PSR"), disclosed July 26, 2011, and Defendant Michael Chandler's Presentence Investigation Report ("Chandler's PSR"), disclosed July 26, 2011.  The Court also accepts the parties' stipulations in the Defendant Carolynne Tilga's Plea Agreement, filed January 6, 2011 (Doc. 126) and Defendant Michael Chandler's Plea Agreement, filed January 6, 2011 (Doc. 128)("Chandler Plea Agreement") that neither Tilga nor Chandler's offenses involved a special skill, an aggravating role, or obstruction of justice, and sustains Tilga and Chandler's objections to portions of the PSRs which suggest otherwise.  See Tilga Plea Agreement ¶10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.  The Court rejects the parties' stipulation that the offense did not involve sophisticated means, and overrules Tilga and Chandler's objections to her PSRs' references to the enhancement.  See Tilga Plea Agreement ¶10(c), at 8; Chandler Plea Agreement ¶ 9(b), at 5.  The Court concludes that Tilga's objections to the PSR's failure to acknowledge the benefits that the United States obtained from the Plea Agreement and failure to explicitly recognize that the sentencing guidelines are advisory are moot.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Joseph M. Giannullo
United Stated Department of Justice
Washington, D.C.

*--and--*

Kenneth J. Gonzales
  United States Attorney
Jonathon M. Gerson
Paula G. Burnett
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Kimberly A. Middlebrooks
Albuquerque, New Mexico

*--and--*

Roma W. Theus, II
Wellington, Florida

> *Attorneys for Defendant Carolynne Tilga*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

> *Attorney for Defendant Michael Chandler*

Angela L. Owens
St. Petersburg, Florida

*--and--*

Kenneth Gleria
Albuquerque, New Mexico

> *Attorneys for Defendant Helen Geer*